**GENERAL MOTORS CORPORATION,**
**Plaintiff,**

v.

**TOYOTA MOTOR COMPANY, LTD.,**
**et al., Defendants.**

**Civ. No. C-3-76-28.**

United States District Court,
S. D. Ohio, W. D.

Feb. 1, 1979.
As Amended May 18, 1979.

George E. Frost, General Motors Corp., Detroit, Mich., Gilbert N. Henderson, Biebel, French & Nauman, Dayton, Ohio, for plaintiff.

Hugh A. Chapin, Kenyon & Kenyon, Reilly, Carr & Chapin, New York City, Arthur D. Gray, New York City, Paul Winterhalter Pickrel, Schaeffer & Ebeling, Dayton, Ohio, for defendants.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

CARL B. RUBIN, District Judge.

This action was brought by General Motors Corporation (General Motors) against Toyota Motor Company, Ltd., Toyota Motor Sales Company, Ltd., and Toyota Mid-America Distributors, Inc. (Toyota) over claims five (5) through eight (8) of United States Patent 3,852,041 ('041 patent). General Motors contends that Toyota infringed the '041 patent. Toyota denies that allegation and, in the alternative, contends that the '041 patent is invalid, as well as unenforceable.

A trial on these issues was held in November and December, 1977. On the basis of the evidence adduced at that trial, this Court submits herewith findings of fact, opinion and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

I

## FINDINGS OF FACT

A. *General Background*

1. A catalytic converter is a device which reduces the concentration of pollutants in car engine exhaust. It operates by subjecting engine exhaust to a chemical reaction before the exhaust is emitted from the tailpipe, rather than by modification of the engine. (R. 196–98)

2. There are two basic types of catalytic converters. A Monolithic Catalytic Converter consists of a ceramic block with a labyrinth of catalyst-coated channels throughout its length. Catalysis occurs by the passage of exhaust gas through these channels. By contrast, a Downflow Cata-

lytic Converter, like the one described by the '041 patent, consists of an inlet chamber, an inner chamber in which catalyst-coated ceramic pellets are contained, and an outlet chamber. Catalysis occurs by the passage of exhaust gas into the inlet chamber, downward through the inner chamber, and out through the outlet chamber. (R. 192–95)

3. Initial interest in catalytic converters was regional and short-lived. The first converters were developed in the early sixties in response to California's stringent car emission standards. However, catalytic converter development ended in the middle of that decade because of converter failure from fuel contamination and structural deformity at high temperatures. (R. 207–08)

4. The spectre of national legislation requiring the cleansing of car exhaust and the introduction of unleaded gasoline as an automobile propellant rekindled interest in catalytic converters in the late sixties. Since it was known generally that a catalytic converter will operate efficiently only if an engine burns unleaded fuel, the automobile industry's switch to unleaded fuel in 1969 transformed catalytic converters into a viable means for achieving the proposed national emissions standards. Put simply, the proposed legislation set a goal and the decision to use unleaded fuel made catalytic converters a practical means of achieving that goal. (R. 199–200; 205–06. Exhibit 416 at H00021)

B. *General Motors' Experience*

1. General Motors is incorporated in Delaware and has its principal place of business in Michigan. It is the largest manufacturer of motor vehicles in the United States.

2. In late 1969, General Motors divided responsibility for development of a catalytic converter among three groups. Both a Catalyst Group and a Catalyst Container Group were created at General Motors' AC Spark Plug Division (AC Spark Plug). In addition, an Applications Group was created at General Motors' Oldsmobile Division. The first group was charged with identifying an appropriate metal to produce the catalytic reaction; the middle group was charged with developing a structure to contain the catalytic reaction; and the latter group was charged with placing the catalytic converters designed by AC Spark Plug on all General Motors' cars. (R. 207; 368–69)

3. The Container Group, in turn, divided-up responsibilities. The Product Engineering Section was responsible for converter design. By contrast, the Production Engineering Section was responsible for developing tools, machines, and facilities for efficiently manufacturing converters designed by the Product Engineering Section. (R. 368; 1222–24; 1390)

4. The skills of the people who worked in these sections were compatible with their job functions. Product Engineering staff members were mechanical engineers with extensive experience in the design of automotive parts. Alternatively, Production Engineering staff members were mechanical engineers who were familiar with efficient ways to manufacture automotive parts. (R. 1222–23)

5. The initial objective of the Container Group was development of a downflow "replaceable element" catalytic converter. Catalysts which had been utilized up to that time were short-lived. Accordingly, it was felt necessary to have a converter to which fresh catalyst could be added periodically. (R. 208–209; 370; 376. Exhibit 220)

6. This type of downflow converter displayed two irremediable problems. First, it consisted of too many parts to be manufactured economically. Second, it leaked. A converter requiring the periodic addition of new catalyst could not be totally welded together. Therefore, under high temperatures, exhaust gas tended to by-pass the converter wherever removable parts joined with other parts. (R. 208–09; 376; 380–81; 1224–27; 1391–93)

7. Because of these problems, the Container Group abandoned replaceable element converters in late June or early July, 1970. Instead, attention was focused on development of a converter without remov-

able parts. Although a "unitized" converter could not be refilled with fresh catalyst, Container Group staff members hoped that its welded seams would prevent the leakage and high costs associated with the replaceable element converter. (R. 261–2; 380–81; 1227–37)

8. The Container Group did not start from scratch in developing unitized converters. In fact, two of these converters had been developed within the Container Group prior to abandonment of the replaceable element converter.

9. The first converter concept developed within the Container Group was the CM–474 sketch. It was conceived on March 26, 1970 by Albert J. Moore, a draftsman for the Product Engineering Section. Moore worked alone in this endeavor. (R. 376–380; 550–54; 1393; 1399; 1411. Exhibit 112)

10. The most distinctive feature of the CM–474 sketch was the upper catalyst retainer plate (catalyst housing). It had a downwardly concave semicircular extension and an upwardly concave semicircular extension. Consequently, when the upper catalyst retainer plate was placed between the top housing plate (outer wrap—upper) and the bottom housing plate (outer wrap—lower), the extensions created an inlet and outlet to the converter. (Exhibit 112)

11. Product Engineering staff members totally ignored the CM–474 sketch. Since the staff members still were concentrating their attention on development of a replaceable element converter in March and April, 1970, they apparently thought that the CM–474 sketch should not be pursued. In any event, Product Engineering never made a model of the CM–474 concept. (Finding No. B(7). R. 550–56; 1411)

12. The second concept developed within the Container Group prior to abandonment of the replaceable element converter, and the first one to be considered actively by the Container Group, was the CM–714 converter. According to a General Motors' Record of Invention it was conceived on June 18, 1970 solely by Andrew Banyas, a Production Engineering staff member, and

by John Jalbing, a staff member of Product Engineering. However, Moore also should be given some credit for the CM–714 converter since it was derived from the CM–474 sketch. (R. 369; 381–82; 710–716; 1222; 1227–37; 1403–4; 1410. Exhibits 113 and 257)

13. Although the CM–714 converter was like the CM–474 sketch in its use of an extended catalyst retainer plate, there were several differences between the two designs. First of all, the CM–714 converter had four plates rather than six. Secondly, both the top and bottom housing plates of the CM–714 converter had two semicircular extensions rather than just one. Finally, the lower catalyst retainer plate in the CM–714 converter, rather than the upper catalyst retainer plate, had extensions into an inlet and outlet formed by the housing plates. (Exhibit 113)

14. The initial tests run on the CM–714 converter in August and September, 1970 produced mixed results. These tests showed that the CM–714 converter successfully reduced the concentration of pollutants in car exhaust and that the CM–714 converter presented very little resistance to exhaust gas flow. However, they also suggested that the CM–714 converter was not durable. The early CM–714 converters tended to balloon and to rupture at relatively low temperatures. (R. 389–96. Exhibit 138D)

15. Despite these disappointing results, the CM–714 converter was not abandoned. General Motors not only continued to perform tests with and on the CM–714 converter well into 1973, but also lauded the CM–714 converter on television and before an American Petroleum Institute meeting in September and November, 1970, respectively. (R. 396–97; 412–14. Exhibit 270)

16. The first type of supplemental experimentation initiated by General Motors was performed with the CM–714 converter, rather than on it. More particularly, the experimentation concerned converter placement, cooling loop routing, and emission and catalyst performance under different

engine parameters, rather than the durability of the CM–714 converter at sustained high temperatures. General Motors began selling CM–714 converters for these purposes to its car divisions in September, 1970. Later that year, offers to sell and sales of CM–714 converters for these purposes also were made to International Harvester Corporation and to American Motors Corporation. In the latter cases, the sales always were made with the express reservation that the buyer respect General Motors' proprietary interests and that the buyer report all test results to General Motors. (R. 212; 400–418; 465; 1360–89; Exhibit 138A)

17. The second type of supplemental experimentation conducted by General Motors sought to evaluate the durability of CM–714 converters made from different types metal and reinforced with different numbers of support studs. These tests were conducted mostly by General Motors between October, 1970 and June, 1973. Generally, they showed that a CM–714 converter made from stainless steel and reinforced with four studs could withstand considerably higher temperatures than could the original CM–714 converters which were unsupported and which were made from aluminized steel. (R. 263–68; 396–97; 568–82. Exhibits 138D, I, K, M and 139)

18. Despite these improved results, the CM–714 converter did not become General Motors' production-line catalytic converter. Another converter was conceived by Michael Foster, Albert Moore and James Haggart in early October, 1970, which had production advantages and some performance characteristics that were unmatched by the CM–714 converter. The new converter was called the CM–1090. (R. 565–67. Exhibits 114 and 270)

19. The CM–1090 converter closely resembled the CM–714 converter. Both designs contemplated four plates; both designs included top and bottom housing plates with two semicircular extensions; and both designs called for a bottom retainer plate with semicircular extensions into an inlet and outlet formed by the housing plates. However, only the CM–1090 converter included an upper retainer plate with semicircular extensions which nested with the semicircular extensions of the bottom retainer plate. Moreover, only the CM–1090 converter included an upper retainer plate with a peripheral flange that extended longitudinally and laterally between the flanges of the other plates. (Exhibit 114)

20. The first CM–1090 converter was built in late January, 1971 and was tested in early February, 1971. The results of those tests were very promising. They showed that CM–1090 converters constructed from stainless steel and reinforced with four studs could withstand over 2000° without structural deformity. (R. 417–24; 584–86. Exhibit 138K)

21. General Motors took two actions because of the encouraging performance of the CM–1090 converter. First of all, it abandoned the CM–714 converter as a production-line alternative well after February, 1971. Secondly, it applied for a patent on the CM–1090 converter on September 7, 1971. (R. 1383–84. Exhibits 101, 138, 139 and 447, 447b–1) [1]

22. General Motors prosecuted its patent application for over three years. The first application was followed by a second application on December 23, 1971. The second application, in turn, was followed by a third application on June 14, 1972. On November 30, 1973, the Patent and Trademark Office (PTO) rejected all but one of the claims contained in the superceding third application. General Motors responded on February 12, 1974 by modifying and narrowing its claims. On April 1, 1974, the PTO allowed all but two of the modified claims. Displeased with this result, General Motors argued its cause orally before the PTO on May 23, 1974. As a result of General Motors' argument and the PTO's own review of four prior art patents—Scheitlin U.S. Patent No. 3,149,925; Fessler U.S. Patent No. 3,600,142; Patterson U.S. Patent No. 3,615,255; and Fessler U.S. Patent No. 3,702,236—all of the claims, as modified on

1. See Appendix A.

February 12, 1974, were allowed. The '041 patent ultimately issued on December 3, 1974. (Exhibits 101, 115, 271, 272 and 274)

23. To date, General Motors has issued one license to manufacture its patented converter. In May, 1975, General Motors licensed Nissan Motor Company, Ltd. to manufacture the patented converter under a pending Japanese patent application which corresponds to the '041 patent. So far, this agreement has generated over one million dollars in royalty income for General Motors. Interestingly, no cars outfitted with converters made under this license are sold within the United States. (R. 623–638. Exhibits 127 and 456)

C. *Toyota's Experience*

1. Toyota Motor Company, Ltd. is a Japanese corporation with its principal place of business in Toyota, Japan. Toyota Motor Sales Company, Ltd. is a Japanese corporation with its principal place of business in Nagoya, Japan. Toyota Mid-America Distributors, Inc., is incorporated in Delaware and has its principal place of business in Carol Stream, Illinois.

2. Toyota's initial research into catalytic converters was not as productive as General Motors'. Although Toyota began to develop converters at about the same time that General Motors did, it did not produce a converter which it thought was suitable for durability testing until October, 1971. (R. 292; 305–06; 313–14. Exhibit 136)

3. The results of this testing program were very disappointing. Prototype converters regularly ruptured or sagged when they were subjected to high temperatures. Accordingly, by early April, 1972, Toyota was looking actively for a new converter design. (R. 306–27. Exhibit 133(21) pp. 856, 863, 877, 895–97. Exhibit 136(23))

4. Toyota found that design at a public hearing conducted in Washington, D. C. on April 17, 1972. At the request of the Environmental Protection Agency, General Motors gave a status report that day on its efforts to achieve the recently enacted federal exhaust emissions standards. As part of its presentation, General Motors displayed and explained a modified version of the CM–1090 converter. Kiyoshi Matsumoto of the Toyota Motor Company, Ltd. seized this opportunity to make a detailed sketch of General Motors' converter which he subsequently delivered to his company's converter research group in Japan. (R. 327–52. Exhibit 134(3))

5. Armed with the Matsumoto sketch, Toyota constructed a converter which contained all of the essential elements of the patented converter, but in slightly modified form. Thus, both designs were alike in their use of: four plates; catalyst retainer plates with extensions into either the inlet or outlet formed by the housing plates; catalyst retainer plates with peripheral flanges that extended laterally and longitudinally between the flanges of the other plates; an inclined catalyst bed; and, two layer peripheral walls immediately inboard the common edge of the four plates. However, the Toyota converter differed from the patented converter to the extent that the former converter had: an upper catalyst retainer plate which extended only into the inlet formed by the housing plates; a lower catalyst retainer plate which extended only into the outlet formed by the housing plates; and, an additional piece of metal attached to the inlet end of the upper catalyst retainer plate. (R. 436–59. Exhibits 107, 109, 117, 118, 120, 134(6)(11)(12), 136(14)(15), 151, 152 and 447) [2]

6. The results of tests run on Toyota's General Motors style converter in 1972 and 1973 were satisfactory. Thus, by June, 1973, Toyota was able to report to the Environmental Protection Agency that it had solved most of the problems which it had confronted only one year earlier. (Exhibit 136(23))

7. It is this modified version of General Motors' patented converter which Toyota ultimately put into production and which General Motors' now asserts infringes claims five (5) through eight (8) of the '041 patent. (Exhibit 120)

2. See Appendix B.

## II

## OPINION

*Introduction*

Three issues are presented for review. First, are claims five (5) through eight (8) of the '041 patent invalid for obviousness? Second, does the Toyota production-line catalytic converter infringe claims five (5) through eight (8) of the '041 patent? Third, are claims five (5) through eight (8) of the '041 patent unenforceable? Since the validity determination is potentially dispositive of all issues, it will be made first.[3]

A) *Validity of the '041 Patent*

■ A trial court must make several factual inquiries before it can make a legal judgment about the validity of a patent under Title 35, United States Code, Section 103.[4] It must: A) delimit the scope of art which is *pertinent* to the subject matter of the patent-in-suit; B) determine whether references within the pertinent art constitute *prior art*; C) identify the differences between the *pertinent prior art* and the disputed claims of the patent-in-suit; and D) evaluate the *level of ordinary skill* in the pertinent art at the time that the patent-in-suit was invented.[5]

Considered together, these findings enable the trial court to identify a criterion for determining validity. The first three findings describe the information which should have been known by an average member of the group of persons to which

the inventor of the patent-in-suit belongs. Alternatively, the fourth finding describes the methodology of an average member of the group of persons to which the inventor of the patent-in-suit belongs. By projecting what a hypothetical person with these characteristics and with this imputed knowledge would do if he were given a specific problem to solve, a trial court can identify an obvious result. The validity of the patent-in-suit then can be determined by simply comparing this result with the patent-in-suit.

1) *Scope of the Pertinent Art*

i) *Applicable Law*

■ The scope of pertinent art is defined by the problem which the patent-in-suit allegedly solves rather than by the type of product which the patent-in-suit describes. Restated, if the inventor of the patent-in-suit could reasonably have been expected to look to a reference to solve the problem which the patent-in-suit allegedly solves, that reference is pertinent art.[6]

■ That is not to say that a reference which describes the same type of product that is discussed by the patent-in-suit ever can be other than pertinent art. All that is meant is that a reference, which describes a different type of product than is described by the patent-in-suit, is nevertheless analogous art and therefore within the scope of pertinent art if it attempts to solve the

3. *Sinclair & Carroll Co., Inc. v. Interchemical Corp.,* 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945).

4. Section 103 provides that:
A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. July 19, 1952, c. 950, § 1, 66 Stat. 798.

5. *Graham v. John Deere,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

6. *Graham, supra* at 35, 86 S.Ct. 684; *In re Grout,* 377 F.2d 1019, 1022, 55 CCPA 1559 (1967); *Johnson & Johnson v. W. L. Gore & Assoc., Inc.,* 436 F.Supp. 704, 718 (D.Del.1977); *Lewart Co. v. Acco Intern., Inc.,* 428 F.Supp. 258, 259 (N.D.Ill.1976) *aff'd,* 558 F.2d 1031 (7th Cir.); *Tokyo Shibaura Electric Co., Ltd. v. Zenith Radio Corp.,* 404 F.Supp. 547, 558–59 (D.Del.1975) *aff'd,* 548 F.2d 88 (3rd Cir.); *Fischer & Parker Co. v. Haskett,* 354 F.Supp. 464, 477 (E.D.Pa.1973); Kitch, "Graham v. John Deere Co.: New Standards for Patents," 49 *J. of Pat. Off. Soc'y,* 237, 287–94 (1967).

same problem which the patent-in-suit allegedly solves.[7]

### ii) *Application of Law to Present Case*

The problem confronted by the inventors of the '041 patent was more one of improving prior downflow catalytic converters (i. e., those which place one container within another container in such a manner than an incoming fluid will enter an inlet chamber and pass through an inner chamber before being expelled through an outlet chamber)[8] than one of pioneering a new catalytic converter design concept. At the time the '041 patent was invented, the advantages of downflow converters over other design concepts were well-known.[9] However, so were the problems exhibited by such converters. In particular, prior downflow catalytic converters were susceptible to exhaust gas bypass of the inner chamber of the converter due to leakage between the outer container and the inner container of the converter after extended usage at high temperatures.[10] Therefore, when the inventors of the '041 patent began their research in early 1969, the scope of pertinent art was restricted to techniques for sealing a container within a container in such a manner that an entering fluid would pass through an inlet chamber, an inner chamber and an outlet chamber.

Tested against this standard, almost all of the references which Toyota cites against the '041 patent are within the scope of pertinent art. Of the ten references cited by Toyota, eight describe the same type of product described by the '041 patent and, therefore, implicitly deal with the same

problem with which the '041 patent deals. In addition, one of the two references which do not describe products of the type described by the '041 patent clearly deals with the same problem treated by the '041 patent.

The eight references which describe the same type of product described by the '041 patent are within the scope of art which is pertinent to the '041 patent. It is axiomatic that devices belonging to the same product line treat the same problems. Restated in terms of the '041 patent, all downflow catalytic converters implicitly attempt to seal one container within another container to produce flow through three chambers. Therefore, Fessler '236[11], a 1963 article in the Journal of the Society of Automotive Engineers (SAE article)[12], Patterson '255[13], Fessler '142[14], Scheitlin '925[15], Johnson '073[16], the CM–474 sketch[17], and the CM–714 converter[18] are within the scope of pertinent art because they, like the '041 patent, describe downflow catalytic converters.

A similar conclusion cannot be drawn with respect to the remaining two references cited by Toyota. Unlike the other references, the remaining two references do not describe products of the type described by the '041 patent: one describes a device for reducing noise generated by an automobile engine (British '013)[19]; the other describes a device for effecting heat exchange between separated fluids (Morrison '314)[20]. Therefore, these two references can be included within the scope of art which is pertinent to the '041 patent only if they attempt to solve the same problem which the '041 patent allegedly solves.

---

7. *Burgess Cellulose Co. v. Wood Flong Corp.*, 431 F.2d 505, 509 (2d Cir. 1970); *Skega Aktiebolag v. B. F. Goodrich Co.*, 420 F.2d 1358, 1359 (6th Cir. 1970); *General Metals Powder Co. v. S. K. Wellman Co.*, 157 F.2d 505, 510 (6th Cir. 1946).

8. Finding of Fact No. A(2).

9. R. 195.

10. R. 1124–1145; Exhibit 421–A.

11. Exhibit 424.

12. Exhibit 423.

13. Exhibit 227.

14. Exhibit 421.

15. Exhibit 425.

16. Exhibit 201.

17. Exhibit 112.

18. Exhibit 113.

19. Exhibit 420.

20. Exhibit 422.

Under this guideline, British '013 is clearly within the scope of art which is pertinent to the '041 patent. Although British '013 actually describes the creation of four chambers by combining two containers, a fluid entering the inlet chamber nevertheless will pass through only one inner chamber before exiting through an outlet chamber. Thus, like the '041 patent, British '013 describes how to seal one container within another container in order to channel an incoming fluid through three chambers before it exits the containers[21]. Accordingly, it is pertinent art.

Conversely, Morrison '314 is outside the scope of art which is pertinent to the '041 patent. While Morrison '314 discloses how to dispose one container within another container in order to create three chambers, it teaches how to channel a fluid through only one of those chambers rather than through all of them. In other words, Morrison '314 teaches how to dispose one container within another container in order to produce leak paths which the inventors of the '041 patent were attempting to eliminate[22]. Accordingly, Morrison '314 is outside the scope of art which is pertinent to the '041 patent.

### 2) *Content of the Pertinent Prior Art*

■ Although a reference is within the scope of pertinent art, it is not automatically available for use against a patent-in-suit. Before a pertinent reference may be used to invalidate a patent-in-suit, it also must constitute prior art.

#### i) *Applicable Law*

■ Prior art is a difficult concept to define. For instance, a literal definition of it is impossible. Although the term suggests that only pertinent art which was available to the public before invention of the patent-in-suit may qualify as pertinent prior art, pertinent art which was not invented until after invention of the patent-in-suit[23], or which was invented before invention of the patent-in-suit but not publicly disclosed until after invention of the patent-in-suit[24], also may constitute pertinent prior art.

■ The only real link among the different categories of pertinent prior art is the uniform impact which the references within them have upon the Patent System's objective of advancement of the arts and sciences[25]. Unlike pertinent art, pertinent prior art always advances the arts and sciences by encouraging prompt disclosure of new concepts[26]. This is because pertinent prior art, unlike pertinent art, always is characterized by a timely public disclosure of pertinent information[27].

---

21. Admittedly, the flow path described by British '013 differs from the flow path described by the '041 patent. (R. 1121). Nevertheless, a fluid which enters either of the devices described by the patents will pass through only three chambers before it exits. (Exhibit 930j).

22. R. 1152–1158.

23. 35 U.S.C. § 102(b). See note 29, *infra*.

24. 35 U.S.C. § 102(g). See note 29, *infra*.

25. Clause 8, Section 8, Article I of the U.S. Constitution provides that:
 The Congress shall have Power . . . To promote the Progress of Science and Useful Arts, by securing for limited Time to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.

26. *Kendall v. Winsor*, 62 U.S. (21 How.) 322, 328, 16 L.Ed. 165 (1859); *Harper v. Zimmermann*, 41 F.2d 261, 267 (D.Del.1930); *Grinnell*

*Corp. v. Virginia Elec. & Power Co.*, 277 F.Supp. 507, 518–19 (E.D.Va.1967), *aff'd*, 401 F.2d 451 (4th Cir. 1968).

27. It is beyond dispute that the timely public disclosure standard for determining pertinent prior art accommodates all of the pertinent prior art described by subdivisions a, b and e of Section 102. Every scenario described by those subdivisions envisions the public disclosure of a pertinent concept through the pertinent art reference before that concept is disclosed through the patent-in-suit. Thus, an inventor is always encouraged to disclose new concepts promptly because he knows that he will receive an unassailable patent monopoly if he is the first inventor to disclose the new concept. See notes 33–34 and accompanying text *infra*.

The controversy centers on whether this standard can be used to divine Section 102(g) pertinent prior art. Many courts have abjured a

There are *twelve* scenarios [28] in which pertinent art will induce prompt public disclosure of new concepts. They are described in 35 U.S.C. § 102, subdivisions a [29], b [30], e [31], and g [32, 33].

### a) Section 102(a) Pertinent Prior Art

■ Section 102(a) describes only one scenario. Put briefly, it describes a pertinent concept which is disclosed to the public through a patent, printed publication, use, or piece of information before invention of the concept embodied in the patent-in-suit [34].

Pertinent art within this scenario always constitutes pertinent prior art. Since an inventor knows that he will be awarded an uncontestable patent monopoly if he is the first person to invent and to disclose his invention to the public, incentive exists for him to disclose his invention promptly.

public disclosure requirement for Section 102(g) pertinent prior art primarily because that statute does not expressly provide for one. *Sutter Products Co. v. Pettibone Mulliken Corp.*, 428 F.2d 639 (7th Cir. 1970); *Compare International Glass Co. v. United States*, 408 F.2d 395, 187 Ct.Cl. 376 (1969) and *In re Bass*, 474 F.2d 1276, 59 CCPA 1342 (1973) (dictum). Nevertheless, some courts and commentators have disagreed. *In re Bass, supra*; *Grinnell, supra*; Albrecht, "Foreign Patent Publications Claiming Priority Based on a U.S. Application: Are they 'Prior Art' under 35 U.S.C. 102(g)", 56 *J. of Pat. Off. Soc'y* 422 (1974).

Logic suggests that a timely public disclosure standard should be superimposed upon Section 102(g). If this standard were not superimposed upon Section 102(g), many scenarios might occur which would totally frustrate the Patent System's objective of advancing the arts and sciences. See notes 45–70 and accompanying text *infra*. Since a statute should be interpreted to promote legislative purpose rather than to defeat it, superimposition of a timely public disclosure standard upon Section 102(g) would seem appropriate.

**28.** Admittedly, the precise meaning of "scenario" is "an outline of the plot of a dramatic or literary work." The American Heritage Dictionary, 1160 (New College Ed., 1976). It is used in this opinion only to describe separate sequences of events.

**29.** Section 102 provides that:
A person shall be entitled to a patent unless—
(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
(c) he has abandoned the invention, or
(d) the invention was first patented or caused to be patented, or was the subject of an inventor's certificate, by the applicant or his legal representatives or assigns in a foreign country

prior to the date of the application for patent in this country or an application for patent or inventor's certificate filed more than twelve months before the filing of the application in the United States, or
(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent, or
(f) he did not himself invent the subject matter sought to be patented, or
(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other. July 19, 1952, c. 950, § 1, 66 Stat. 797.

**30.** See Note 29, *supra*.

**31.** See Note 29, *supra*.

**32.** See Note 29, *supra*.

**33.** Although some commentators (Chisum, "Source of Prior Art in Patent Law", 52 Wash. L.Rev. 1 (1976)) and courts (*In re Harry*, 333 F.2d 920, 923 n. 1, 51 CCPA 1541 (1964)) contend that other subdivisions of Section 102 describe scenarios in which pertinent art becomes pertinent prior art, only subdivisions a, b, e, and g include language which can be construed to refer to prior art as well as to a patent-in-suit. *In re Bass*, 474 F.2d 1276, 1295 n.3, 59 CCPA 1342 (1973); *Deep Welding, Inc. v. Sciaky*, 417 F.2d 1227, 1233 (7th Cir. 1969); *Compare Nat. Rolled Thread, etc. v. E. W. Ferry Screw Prod.*, 541 F.2d 593, 596 n.3 (6th Cir. 1976).

**34.** See row 1 of Appendices C1 and C2.

b) *Section 102(b) Pertinent Prior Art*

▮ In contrast to Section 102(a), Section 102(b) describes five scenarios. They are: a) actual public disclosure of a pertinent concept through a patent, printed publication, use or sale before invention of the concept embodied in the patent-in-suit and more than one year before application is made for the patent-in-suit [35]; b) application for a patent on a pertinent concept before invention of the concept embodied in the patent-in-suit, and issuance of the pertinent patent after invention of the concept embodied in the patent-in-suit but more than one year before application is made for the patent-in-suit [36]; c) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, and actual public disclosure of the pertinent concept through a printed publication, sale or use after invention of the concept embodied in the patent-in-suit but more than one year before application is made for the patent-in-suit [37]; d) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, and application for and issuance of a pertinent patent after invention of the concept embodied in the patent-in-suit but more than one year before application is made for the patent-in-suit [38]; and e) invention of a pertinent concept and actual public disclosure of it through a patent, printed publication, use or sale after invention of the concept embodied in the patent-in-suit but more than one year before application is made for the patent-in-suit [39].

Pertinent art described by these scenarios also constitutes pertinent prior art. Since an inventor knows that he will be awarded an uncontestable patent monopoly if he is the first person to disclose a concept to the public, even though he may not have been the first person to invent the concept, prompt disclosure of new concepts is inevitably encouraged.

c) *Section 102(e) Pertinent Prior Art*

▮ Section 102(e) describes four scenarios. They are: a) actual disclosure of a pertinent concept through a patent before invention of the concept embodied in the patent-in-suit [40]; b) application for a patent on a pertinent concept before invention of the concept embodied in the patent-in-suit, and issuance of the pertinent patent before application is made for the patent-in-suit [41]; c) application for a patent on a pertinent concept before invention of the concept embodied in the patent-in-suit, and issuance of the pertinent patent after application is made for the patent-in-suit but before the patent-in-suit issues [42]; and d) application for a patent on a pertinent concept before invention of the concept embodied in the patent-in-suit, and issuance of the pertinent patent after issuance of the patent-in-suit [43].

All of these scenarios describe pertinent prior art. Like pertinent art described by Sections 102(a) and 102(b), Section 102(e) pertinent art motivates inventors to disclose new concepts as promptly as possible. Assuming that the application date for a patent which is later issued is always considered the date on which the invention embodied in the patent was publicly disclosed [44], an inventor knows that he will be awarded an uncontestable patent monopoly if he is the first person to apply for a patent on a new concept.

35. *Id.*

36. See row 2 of Appendix C1.

37. See row 2 of Appendix C2.

38. See row 6 of Appendix C1.

39. See row 15 of Appendix C1 and row 6 of Appendix C2.

40. See row 1 of Appendix C1.

41. See row 2 of Appendix C1.

42. See row 3 of Appendix C1.

43. See row 4 of Appendix C1.

44. See *Alexander Milburn Co. v. Davis-Bournonville Co.,* 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651 (1926); and *Hazeltine Research, Inc. v. Brenner,* 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1966).

d) Section 102(g) Pertinent Prior Art

In contrast to the other subdivisions of Section 102, Section 102(g) describes eighteen scenarios. They are: a) actual public disclosure of a pertinent concept by any means before invention of the concept embodied in the patent-in-suit [45]; b) application for a patent on a pertinent concept before invention of the concept embodied in the patent-in-suit, and issuance of the pertinent patent after invention of the concept embodied in the patent-in-suit but before application is made for the patent-in-suit [46]; c) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, and actual public disclosure of the pertinent concept by any means other than through a patent after invention of the concept embodied in the patent-in-suit but before application is made for the patent-in-suit [47]; d) application for a patent on a pertinent concept before invention of the concept embodied in the patent-in-suit, and issuance of the pertinent patent after application is made for the patent-in-suit but before the patent-in-suit issues [48]; e) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, and actual public disclosure of the pertinent concept by any means other than through a patent after application is made for the patent-in-suit but before the patent-in-suit issues [49]; f) application for a patent on a pertinent concept before invention of the concept embodied in the patent-in-suit, and issuance of the pertinent patent after issuance of the patent-in-suit [50]; g) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, and actual public disclosure of the pertinent concept by any means other than through a patent after issuance of the patent-in-suit [51]; h) application for a patent on a pertinent concept before invention of the concept embodied in the patent-in-suit, and the subsequent withdrawal of the application [52]; i) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, and no subsequent public disclosure of the pertinent concept [53]; j) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, and the application for and issuance of a pertinent patent after invention of the concept embodied in the patent-in-suit but before application is made for the patent-in-suit [54]; k) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, application for a patent on the pertinent concept after invention of the concept embodied in the patent-in-suit but before application is made for the patent-in-suit, and issuance of the pertinent patent after application is made for the patent-in-suit but before the patent-in-suit issues [55]; l) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, application for a patent on the pertinent concept after invention of the concept embodied in the patent-in-suit but before application is made for the patent-in-suit, and issuance of the pertinent patent after the patent-in-suit issues [56]; m) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, application for a patent on the pertinent concept after invention of the concept embodied in the patent-in-suit but before application is made for the patent-in-suit, and the subsequent withdrawal of the application for the pertinent patent [57]; n) inven-

---

45. See row 1 of Appendices C1 and C2.

46. See row 2 of Appendix C1.

47. See row 2 of Appendix C2.

48. See row 3 of Appendix C1.

49. See row 3 of Appendix C2.

50. See row 4 of Appendix C1.

51. See row 4 of Appendix C2.

52. See row 5 of Appendix C1.

53. See row 5 of Appendix C2.

54. See row 6 of Appendix C1.

55. See row 7 of Appendix C1.

56. See row 8 of Appendix C1.

57. See row 9 of Appendix C1.

tion of a pertinent concept before invention of the concept embodied in the patent-in-suit, and application for and issuance of a pertinent patent after application is made for the patent-in-suit but before the patent-in-suit issues [58]; o ) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, application for a patent on the pertinent concept after application is made for the patent-in-suit but before the patent-in-suit issues, and issuance of the pertinent patent after the patent-in-suit issues [59]; p) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, application for a patent on the pertinent concept after application is made for the patent-in-suit, and the subsequent withdrawal of the application for a patent on the pertinent concept [60]; q) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, and application for and issuance of the pertinent patent after the patent-in-suit issues [61]; and r) invention of a pertinent concept before invention of the concept embodied in the patent-in-suit, application for a patent on the pertinent concept after the patent-in-suit issues, and the subsequent withdrawal of the application for a patent on the pertinent concept [62].

To summarize, thirteen of the eighteen scenarios describe pertinent art which publicly disclosed a pertinent concept [63]. Eight of those thirteen scenarios, in turn, describe pertinent art which publicly disclosed a pertinent concept before disclosure of the concept embodied in the patent-in-suit [64]. Furthermore, of those eight scenarios, six are restricted to pertinent patents [65], one is re-

stricted to pertinent references other than patents [66], and one does not impose any restriction on the type of pertinent reference [67]. Alternatively, three of the five scenarios describing pertinent art which publicly disclosed a pertinent concept after disclosure of the concept embodied in the patent-in-suit are restricted to pertinent patents [68], and two of the five scenarios are restricted to pertinent references other than patents [69].

There is little question that the pertinent art described by scenarios a, b, c, d, f, j, k and l constitutes pertinent prior art. Since an inventor can be assured that a patent issued on a concept which he was first to disclose to the public will be impervious to challenge, use of this kind of pertinent art clearly will encourage prompt disclosure of new concepts.

Pertinent art described by scenarios n, o, or q also constitutes pertinent prior art despite the fact that the concept embodied therein is disclosed to the public after public disclosure of the concept embodied in the patent-in-suit. On first blush, a contrary conclusion might be expected since use of a reference which publicly disclosed the same concept embodied in the patent-in-suit after that concept was disclosed through the patent-in-suit seemingly would remove any incentive to disclose new concepts. However, this expectation is unfounded. The first inventor to disclose the new concept still has the assurance that his patent will be protected if he constructively discloses the new concept more than one year before it is constructively disclosed through the asserted reference [70].

---

58. See row 10 of Appendix C1.

59. See row 11 of Appendix C1.

60. See row 12 of Appendix C1.

61. See row 13 of Appendix C1.

62. See row 14 of Appendix C1.

63. See scenarios a, b, c, d, e, f, g, j, k, l, n, o, q.

64. See scenarios a, b, c, d, f, j, k, l.

65. See scenarios b, d, f, j, k, l.

66. See scenario c.

67. See scenario a.

68. See scenarios n, o and q.

69. See scenarios e and g.

70. Assuming that the application date of the patent-in-suit could be considered the constructive public disclosure date, 35 U.S.C. § 102(e), the patent-in-suit, in effect, would become Section 102(b) prior art against the reference patent.

Alternatively, pertinent art described by scenarios h, i, m, p, or r does not constitute pertinent prior art. If an inventor knew that a concept which he patented could be challenged successfully by a prior secret invention despite his utmost diligence in disclosing the concept to the public, the unavoidable risk of invalidation undoubtedly would discourage further public disclosures.

■ Finally, the pertinent art described by scenarios e or g does not constitute pertinent prior art. The use of such references clearly would discourage inventors from disclosing new concepts. Unlike the patent-in-suit in scenarios n, o and q, the patent-in-suit in scenarios e and g never could be asserted as prior art against the pertinent art described by those scenarios, since the latter kinds of pertinent art do not include patents. Accordingly, the first inventor to disclose could not be assured that his patent would be protected if he disclosed the concept embodied therein more than one year before its disclosure through the reference.

### ii) Application of Law to Present Case

Tested against the foregoing definition of prior art, only eight of the nine pertinent references cited by Toyota constitute pertinent prior art. Three of the eight references are pertinent prior art because they are described by subdivisions a, b, e and g of Section 102; two of the eight references are pertinent prior art because they are described by subdivision e of Section 102; one of the eight references is pertinent prior art because it is described by subdivisions a, b and g of Section 102; one of the eight references is pertinent prior art because it is described by subdivisions a and g of Section 102; and one of the eight refer-

ences is pertinent prior art because it is described by subdivision g of Section 102.

### a) External Pertinent Prior Art

■ Scheitlin '925[71], British '013[72], and Johnson '073[73] clearly constitute pertinent prior art. The earliest that the '041 patent could have been invented was early February, 1971. Even though the concept embodied in the '041 patent was conceived in October, 1970[74], it was not reduced to practice until the beginning of February, 1971.[75] By contrast, the concepts embodied in Scheitlin '925, British '013, and Johnson '073, not only were invented before January, 1971, but also were publicized well-before then.[76] Thus, all four references are described by subdivisions a, b, e, and g of Section 102 and, therefore, constitute pertinent prior art.

The SAE article[77] likewise is pertinent prior art. Like the concepts embodied in the previous references, the concept embodied in the SAE article was actually disclosed to the public before the invention date of the '041 patent[78]. However, unlike the previous references, the SAE article was not patented. Accordingly, it constitutes pertinent prior art only under subdivisions a, b and g of Section 102.

■ Patterson '255[79] and Fessler '142[80] constitute pertinent prior art for a different reason. The concepts embodied in Patterson '255 and Fessler '142 were not *actually* disclosed to the public before the invention date of the '041 patent. However, they were invented and *constructively* disclosed before that date. In both cases, a patent on the concept embodied in the reference was applied for before the invention date of the '041 patent and was issued after inven-

71. Exhibit 425.

72. Exhibit 420.

73. Exhibit 201.

74. See Finding of Fact B(18).

75. See Finding of Fact B(20).

76. See Appendix D.

77. Exhibit 423.

78. See Appendix D.

79. Exhibit 227.

80. Exhibit 421.

tion of the '041 patent [81]. Thus, both references are described by Section 102(e) and, therefore, constitute pertinent prior art.

■ Fessler '236 [82,83] also constitutes pertinent prior art. If the concept embodied in Fessler '236 were invented before the invention date of the '041 patent, Fessler '236 would constitute Section 102(g) pertinent prior art because it would have been constructively disclosed to the public before public disclosure of the invention embodied in the '041 patent. Conversely, if the invention date of Fessler '236 were after the invention date of the '041 patent, Fessler '236 would not constitute pertinent prior art. Under such circumstances, doubt should be resolved against the patentee in order to avoid the possibility that an invalid patent might issue because of unavailability of a potentially invalidating prior art reference [84]. Since General Motors has not produced any evidence which would suggest that Fessler '236 was invented after the '041 patent, it follows that Fessler '236 may be cited against the '041 patent.

### b) Internal Pertinent Prior Art

### 1) CM–474 Sketch

Determination of whether the CM–474 sketch constitutes pertinent prior art requires a more detailed inquiry. First, it must be determined whether the CM–474 sketch was developed by the same entity that developed the '041 patent. If it was not, it then must be determined whether the CM–474 sketch embodies an invention. Provided that it does, it also must be determined whether the invention embodied in the CM–474 sketch was publicly disclosed. If so, it finally must be determined whether

that invention was abandoned, suppressed or concealed before the invention date of the '041 patent.

### i) Creative Entity

■ The initial inquiry in determining the status of the CM–474 sketch is whether the sketch and the '041 patent were developed by the same entity. The answer to this question is potentially dispositive, because a reference may constitute Section 102 pertinent prior art only if it was developed by an entity which is different from the one which developed the patent-in-suit [85].

Although the parties' positions on this question are clear, their arguments are cryptic. Predictably, General Motors contends that the CM–474 sketch and the '041 patent were developed by the same entity. In support of this contention, General Motors apparently argues that the CM–474 sketch was the product of a joint endeavor by Moore, Haggart and Foster to develop the joint invention embodied in the '041 patent, and, therefore, should be treated as though it is one and the same with the '041 patent [86]. In opposition, Toyota contends that Moore developed the CM–474 sketch independently of the other two joint inventors of the '041 patent.

■ If several persons collaborate to produce a joint invention, the conceptions and inventions of one of them will be assimilated into the joint invention only if those conceptions and inventions were generated by the collaborative effort which produced the joint invention [87]. Therefore, a conception or invention which is developed by a

---

81. See Appendix D.

82. Exhibit 424.

83. See Appendix D.

84. See notes 93–94 and accompanying text infra.

85. See generally In re Land, 368 F.2d 866, 54 CCPA 806 (1966).

86. Plaintiff cites Monsanto v. Kamp, 269 F.Supp. 818 (D.D.C.1967) in support of this contention.

87. Thropp & Sons Co. v. DeLaski & Thropp Circular Woven Tire Co., 226 F. 241 (3d Cir. 1915); McKinnon Chain Co. v. American Chain Co., 268 F. 353 (3d Cir. 1920); Pointer v. Six Wheel Corp., 177 F.2d 153 (9th Cir. 1949); S. W. Farber, Inc. v. Texas Instruments, Inc., 211 F.Supp. 686 (D.Del.1962). Compare Norton Co. v. Carborundum Co., 397 F.Supp. 639 (D.Mass.1975).

joint inventor before commencement of the collaborative effort never can be treated as the conception of a joint invention or as a joint invention because it is not the result of a collaborative effort to produce a joint invention. However, if the prior conception or invention is modified as a result of a collaborative effort, the modified conception or invention may become the conception of a joint invention or a joint invention.

 Under this standard, the CM–474 sketch is the separate conception or invention of Moore. The evidence amply demonstrates that the CM–474 sketch was not generated by the collaboration of Moore, Foster and Haggart. First of all, Moore and Haggart could not have collaborated because Haggart was not a member of the General Motors group which developed the catalytic converter at the time Moore drew his sketch [88]. Secondly, Moore and Foster could not have collaborated because they were pursuing antithetical lines of inquiry [89]. Moore's CM–474 sketch depicts a unitary catalytic converter in which the catalyst element is not removable. By contrast, Foster was concerned exclusively with the development of a replaceable element converter at the time that the CM–474 sketch was made. Accordingly, the CM–474 sketch was the sole conception or invention of Moore rather than the product of a collaborative effort by Moore, Haggart and Foster.

### ii) *Existence of Invention*

 The second consideration in determining the status of the CM–474 sketch is whether it embodies an invention. Like the inquiry into creative entities, this inquiry also is potentially dispositive since a reference must embody an invention in order to constitute prior art.

The parties' disagreement on this issue is rooted in law rather than in fact. General Motors contends that the sketch lacks invention because the conception which it discloses never was reduced to practice [90]. In opposition, Toyota contends that the sketch embodies an invention because reduction to practice is unnecessary where, as here, the proposed reference discloses a conception in sufficient detail " . . . to enable one skilled in the art to reduce [the conception] to practice." [91]

 With few exceptions, invention occurs only when a conception is reduced to practice. This rule is designed " . . . to benefit the public as well as to protect the inventor. An inventor, who reduced his invention to practice in such a complete way that he at once perfects it as an invention and, at the same time, practically demonstrates its utility, is clearly to be preferred to one who merely makes hints and suggests to others and who failed himself to carry them into practice." [92]

However, this rule is not inflexible. In ex parte proceedings, as opposed to interference proceedings, a printed publication or public knowledge, which discloses a conception in sufficient detail " . . . to enable one skilled in the art to reduce [the conception] to practice," may embody an invention and thereby constitute potential prior art, even though it is unclear whether the conception which the publication or knowledge discloses was reduced to practice [93].

This exception is based upon practical necessity. Unlike the parties in an inference proceeding, the parties in an ex parte proceeding do not have enough familiarity with the asserted reference to establish

---

**88.** R.1411. See Finding of Fact B(9).

**89.** R.376–380; 550–54; 1393. See Finding of Fact B(9).

**90.** Plaintiff cites *In re Schlittler*, 234 F.2d 882, 43 CCPA 986 overruled in part by *In re Borst*, 345 F.2d 851, 52 CCPA 1398 (1965); and *Kear v. Roder*, 115 F.2d 810, 28 CCPA 774 (1940), in support of its contention.

**91.** *In re Borst*, 345 F.2d 851, 855, 52 CCPA 1398 (1965).

**92.** 1 Deller's Walker on Patents § 46 at 201–02.

**93.** *In re Borst, supra* at 855; *Kear, supra.*

when it was reduced to practice [94]. Therefore, if a conception, which is disclosed either by printed publication or by public knowledge, had to be reduced to practice before the asserted reference could embody an invention and thereby constitute potential prior art, many invalid patents might issue because of the parties' inability to establish when the asserted prior art reference was reduced to practice. Conversely, the exception does not apply, even in an ex parte proceeding, where one of the parties has the ability to establish when the conception disclosed by the asserted reference was reduced to practice.

■■■ Although some references might be excepted from operation of the conventional rule of invention, the CM–474 sketch is not among them. In the present case, one of the litigants (General Motors) actually developed the contested reference. Accordingly, the CM–474 sketch can embody an invention only if Toyota first shows that the sketch was reduced to practice.

Toyota has not met this burden. As Toyota concedes in its pretrial brief, " '[after] Moore failed to convince Foster of the merits of the CM–474 the drawing was put away and nothing further was done with it.' " [95] Since it is "well established that a conception evidenced by disclosure, drawings, and even a model, confers no rights upon an inventor unless followed by some other act, such as actual reduction to practice, or filing an application for patent," [96] it follows that the CM–474 sketch does not embody an invention and, therefore, does not constitute pertinent prior art of any type.

### 2) CM–714 Converter

Determination of whether the CM–714 converter constitutes pertinent prior art requires the same detailed inquiry which was used to analyze the CM–474 sketch. Restated, the CM–714 converter may be cited

against the '041 patent only if it embodies an *invention* which: (1) was created by a different entity than was responsible for the '041 patent; (2) was publicly disclosed; (3) and was not abandoned, suppressed or concealed before the invention date of the '041 patent.

#### i) *Creative Entity*

The parties initially dispute who developed the CM–714 converter. General Motors contends that development of the CM–714 converter, like that of the CM–474 sketch, should be credited to the joint inventors of the '041 patent. Since the CM–714 converter allegedly was derived from the CM–474 sketch, General Motors reasons that the CM–714 converter is really attributable to the joint inventors of the '041 patent because the CM–474 sketch is one and the same within the '041 patent. Toyota disagrees. It contends that, even if the CM–714 converter were derived from the CM–474 sketch, the CM–714 converter still would be the creation of someone other than the joint inventors of the '041 patent because Moore alone is responsible for the CM–474 sketch.

The previous attribution of credit for the CM–474 sketch controls the determination of who developed the CM–714 converter. General Motors' contention that the CM–714 converter should be attributed to the joint inventors of the '041 patent rests upon the validity of attributing the development of the CM–474 sketch to the joint inventors of the '041 patent. However, it already has been established that the CM–474 sketch was the sole product of Moore [97]. Therefore, even if the CM–714 converter were derived from the CM–474 sketch, it still would be the product of an entity different from the one which created the '041 patent.

#### ii) *Existence of Invention*

The parties also dispute whether the CM–714 converter embodies an invention. Gen-

---

**94.** *Kear, supra.*

**95.** Defendant's Pre-Trial Brief, p. 67. *See also* Finding of Fact B(11).

**96.** *Automatic Weighing Machine Co. v. Pneumatic Scale Corp.,* 166 F. 288, 289 (1st Cir. 1909).

**97.** See notes 85–89 and accompanying text *supra.*

eral Motors contends that the CM–714 converter lacks invention because the conception which it discloses never was commercially successful and, therefore, never was reduced to practice[98]. In opposition, Toyota contends that the CM–714 converter embodies an invention because it performed the function for which it was intended and, therefore, was reduced to practice[99].

Generally, a conception is reduced to practice whenever a device embodying the conception is tested " . . . in such a way as to demonstrate [the device's] practical utility for its intended purpose . . beyond probability of failure."[100] "Satisfactory reduction to practice of [a conception], however, does not demand proof of successful commercial use."[101] Thus, a conception "may be reduced to practice by building a working model and operating it under simulated field conditions without the necessity of showing successful commercial use."[102]

Assuming that the CM–714 converter may be used as prior art only if it were reduced to practice, that event occurred early in January, 1971. Imputing the intended purpose of the '041 converter to the CM–714 converter, the latter device was designed to control automobile emissions by eliminating exhaust gas by-pass of the converter catalyst due to failure of the catalyst housing[103]. Concededly, eleven CM–714 converters failed to achieve this goal because of structural deformity at high temperatures. However, twenty-eight CM–714 converters, beginning with one tested be-

fore January 7, 1971, did meet the CM–714 converter's intended purpose[104]. Therefore, when read together, these tests demonstrate that the CM–714 converter was more likely to achieve its intended purpose than fail to achieve it.

### iii) *Public Disclosure of Invention*

By itself, invention of the CM–714 converter prior to the invention date of the '041 patent does not make the CM–714 converter prior art against the '041 patent. Before the CM–714 converter can constitute Section 102 pertinent prior art, the invention which it embodies must have been publicly disclosed before the invention date of the '041 patent.

Generally speaking, an invention is publicly disclosed when it is placed "on sale" to someone outside the inventorship entity. By making one unrestricted sale of his invention, the inventor theoretically reveals his secret to the public[105].

In the context of Patent Law, an invention may be placed "on sale" in two ways. First, it may be placed "on sale" by an actual and completed transaction[106]. Under this interpretation, an inventor must construct a physical specimen of his invention and deliver it to a third party who accepts it before the invention is technically "on sale." Alternatively, an invention is placed "on sale" whenever its "inventor or his company engages in any activity to sell the [invention]," including making an offer for sale[107]. "This is true, even when (a) but

**98.** Plaintiff cites *Payne v. Hurley*, 71 F.2d 208, 210, 21 CCPA 1144 (1934) and *Sinko Tool v. Automatic Devices*, 157 F.2d 974, 977 (2d Cir. 1946), in support of its contention.

**99.** Defendants cite *Ajem Labs, Inc. v. C. M. Ladd Co.*, 424 F.2d 1124 (6th Cir. 1970) in support of their contention.

**100.** *Toledo Scale Corp. v. Westinghouse Electric Corp.*, 351 F.2d 173, 182 (6th Cir. 1965).

**101.** Id.

**102.** *Ajem, supra* at 1127, summarizing *Toledo, supra.*

**103.** See notes 8–10 and accompanying text *supra.*

**104.** See Exhibit 139, tabs 1–49.

**105.** *Egbert v. Lippmann*, 104 U.S. 333, 336, 26 L.Ed. 755 (1882); *Consolidated Fruit-Jar Co. v. Wright*, 94 U.S. 92, 99, 24 L.Ed. 68 (1877); *Dunlop Co., Ltd. v. Kelsey-Hayes Co.*, 484 F.2d 407, 413 (6th Cir. 1973).

**106.** *B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co.*, 124 F.2d 95, 97 (1st Cir. 1941).

**107.** *Amphenol Corp. v. General Time Corp.*, 397 F.2d 431, 433 (7th Cir. 1968).

one offer has been made to but one customer; (b) the prices are only estimated rather than established; (c) no commercial production runs have been made; and (d) the alleged invention is never sold." [108]

■ The "on sale" rule has one exception. Even though title to an article which embodies an invention may have passed out of the inventorship entity, the invention will not be considered to be "on sale" if the transaction was for an experimental use [109]. This exception is designed to insure that an inventor has a reasonable time from the date of his invention in which "to perfect his idea before applying for a patent." [110]

■ Two elements must be present for the experimental use exception to apply. First, "the contract of sale or offer for sale [must] contain an express or clearly implied condition that the sale or offering is made primarily for experimental use." [111] Second, "the experimentation must relate to the subject matter of the [invention]." [112]

■ Applying these principles to the present case, it must be concluded that the CM–714 converter was "on sale", and therefore publicly disclosed,[113] prior to the invention date of the '041 patent. The evidence establishes that General Motors sold sample CM–714 converters to an unallied party before the invention date of the '041 patent, and that the experimentation for which those CM–714 converters were used did not relate to the subject matter of the invention embodied in them.

Without a doubt, the CM–714 converter was offered for sale and sold to an entity outside General Motors before the invention date of the '041 patent. An International Harvester Corporation (International Harvester) purchase order dated September 16, 1970, indicates that the purchase order was sent to General Motors to confirm an arrangement reached between those two companies on the previous day.[114] Although the purchase order does not expressly state that it was made in response to an offer from General Motors, the inference is clear that it was. In any event, that offer ripened into a completed transaction on November 10, 1970, when delivery of the ordered CM–714 converter ultimately was made [115].

It also is clear that these sales were not within the experimental use exception. Although the CM–714 converters purchased by International Harvester were sold for experimental use, the experimentation which International performed did not relate to the invention embodied in the CM–714 converter.

Concededly, the CM–714 converters purchased by International Harvester were sold for experimental use. First of all, much of the correspondence exchanged between International Harvester and General Motors expressly stated that the CM–714 converters being shipped to International Harvester were "experimental." [116] Moreover, experimental purpose can be implied from activities which prefaced the offers for sale and sales of the CM–714 convert-

**108.** *Chromalloy Am. Corp. v. Alloy Surfaces Co.,* 339 F.Supp. 859, 869 (D.Del.1972).

**109.** *Elizabeth v. Pavement Co.,* 97 U.S. 126, 24 L.Ed. 1000 (1878); *Minnesota Mining & Mfg. Co. v. Kent Industries, Inc.,* 409 F.2d 99 (6th Cir. 1969).

**110.** *Watson v. Allen,* 103 U.S.App.D.C. 5, 9, 254 F.2d 342, 346 (1958); 2 Deller's Walker on Patents § 145.

**111.** *Robbins Co. v. Lawrence Mfg. Co.,* 482 F.2d 426, 433 (9th Cir. 1973).

**112.** *Minnesota, supra* at 101; *Kalvar Corp. v. Xidex Corp.,* 384 F.Supp. 1126 (D.Cal.1973), *aff'd* 556 F.2d 966 (9th Cir. 1977).

**113.** The conclusion that General Motors publicly disclosed the CM–714 converter before invention of the '041 patent is supported by more than its sale of the CM–714 converter to unallied customers. ·In fall, 1970, General Motors publicly displayed the CM–714 converter on television and before the American Petroleum Institute. See Finding of Fact B(15).

**114.** Exhibit 401.

**115.** Exhibits 138A and 270.

**116.** Exhibits 403 and 404.

er [117]. General Motors not only elicited a pledge from International Harvester that it would protect General Motors' proprietary interests in the CM–714 converter, but also demanded and received reports from International Harvester on the latter's experimentation with the CM–714 converter [118].

However, it is equally clear that the experimentation which International Harvester performed did not relate to the invention embodied in the CM–714 converter. Drawing upon the '041 patent by analogy, the invention embodied in the CM–714 converter related to the structure of the catalyst housing and not to the catalyst. By contrast, the experiments performed by International Harvester concerned converter emission performance, converter placement, and cooling loop routing, rather than the durability of the catalyst housing at different temperatures [119]. In fact, General Motors actually precluded International Harvester from experimenting with the invention embodied in the CM–714 converter by admonishing it against testing the converter at temperatures above 1500° [120].

### iv) *Abandonment of Invention*

The final consideration in determining whether the CM–714 converter constitutes pertinent prior art is whether the CM–714 converter was abandoned, suppressed or concealed within the meaning of Section 102. General Motors contends that the CM–714 converter was abandoned under Section 102 because the CM–714 converter ultimately was deserted in favor of the '041 patent. In opposition, Toyota contends that the CM–714 converter was not abandoned under Section 102 because it was not deserted by General Motors until after the invention date of the '041 patent.

An inventor can abandon his right to patent his invention either actually or constructively. Volition distinguishes the two means. Actual abandonment is always intentional. Conversely, constructive abandonment "occurs irrespective of the inventor's intention." [121]

Actual abandonment can be either express or implied.

It is said to be 'express' when the inventor indicates by express words that he does not seek patent protection, or that he does not intend to preclude the public from availing itself freely of the benefits of his invention.[122]

Alternatively, it is implied when the inventor performs an act which demonstrates an intent to forsake patent protection for his invention, such as disclosing the invention in a patent application but not claiming it therein [123].

By contrast, constructive abandonment is statutory. Section 102(b) of Title 35 expressly provides that an inventor, who publicly discloses his invention more than one year before the date on which he applies for a patent on it, loses his right to patent that invention. This type of abandonment is sometimes referred to as statutory forfeiture [124].

The effect of abandonment upon the utility of a reference as pertinent prior art turns on whether the asserted reference constitutes an invention. Sound authority indicates that so long as the asserted prior art reference constitutes invention, (i. e., conceived and *reduced to practice*), its subsequent abandonment is meaningless [125].

117. See *Kalvar, supra* at 1136.

118. See Exhibits 139, 405, 407, 408, 411 and 413 at p. H00021.

119. See Finding of Fact B(16).

120. See Exhibit 413 at p. H00040.

121. Revise and Caesar § 279.

122. Id.

123. *In re Gibbs*, 58 CCPA 901, 437 F.2d 486 (1971).

124. 2 Deller's Walker on Patents § 130.

125. *Corona Co. v. Dovan Corp.*, 276 U.S. 358, 383, 48 S.Ct. 380, 72 L.Ed. 610 (1928); *White v. Fafnir Bearing Co.*, 263 F.Supp. 788, 804–5 (D.Conn.1966); *Joseph Bancroft & Sons Co. v. Brewster Finishing Co.*, 113 F.Supp. 714, 716–17 (D.N.J.1953). *Compare Lyon v. Bausch & Lomb Optical Co.*, 224 F.2d 530, 534 (2d Cir.

Thus, *Deller's Walker on Patents* states that "Novelty is not generally negatived by an unsuccessful experiment," but that, "where an experiment [is] completed and [is used] sufficiently to demonstrate its practicability, . . . abandonment of its use furnishes no warrant to a patentee to claim it as its first inventor." [126]

However, this rule has one twist. Under Section 102(g), only inventions which are abandoned after the invention date of a patent-in-suit may constitute pertinent prior art. According to the Seventh Circuit, "abandonment is irrelevant unless it occurred "before the applicant's invention". The use of the pluperfect tense—'had not abandoned'—plainly refers to an abandonment which occurred 'before the applicant's invention.' " [127]

Tested against these principles, the CM–714 converter was not abandoned within the meaning of Section 102. It never was constructively abandoned. Moreover, it was not actually abandoned until well after the invention date of the '041 patent.

The evidence does not disclose constructive abandonment of the CM–714 converter. As suggested earlier, constructive abandonment occurs by operation of Section 102(b). That statute dictates forfeiture only if the inventor has applied for a patent on his invention. Since the inventors of the CM–714 converter never applied for a patent on their invention, it follows that Section 102(b) constructive abandonment is precluded.

It also is clear that the CM–714 converter was not actually abandoned until after the invention date of the '041 patent. Both testimony and business records indicate that durability experiments were performed on the CM–714 converter well after early February, 1971 [128].

On the basis of the foregoing review, the CM–714 converter clearly constitutes pertinent prior art. As was established earlier, the '041 patent was invented in early February, 1971. By contrast, the CM–714 converter was invented and publicly disclosed [129] no later than January 7, 1971. Accordingly, the CM–714 converter constitutes pertinent prior art under Sections 102(a) and 102(g).

### 3) Differences Between the Pertinent Prior Art and the Disputed Claims of the '041 Patent

The third factual inquiry which must be made in order to determine the validity of a patent-in-suit is whether differences exist between the pertinent prior art and the disputed claims of the patent-in-suit. Rephrasing the inquiry in terms of the elements disclosed by the disputed claims of the '041 patent, this Court must determine whether any of the eight pertinent prior art references teach: 1) extension of the retainer plates into the inlet portion of the housing plates so that incoming exhaust gas will be directed over three plates and under one plate, as well as extension of the retainer plates into the outlet portion of the housing plates so that outgoing exhaust gas will be directed over one plate and under three plates; 2) extension of the outboard flanges on the retainer plates longitudinally and laterally so that, together with the outboard flanges of the housing plates, a four-layer edge is formed around the entire periphery of the converter; 3) construction of the retainer plates and housing plates so that they "are substantially juxtaposed in the vertical direction immediately inboard their peripheries;" or 4) canting the retainer plates so that the catalyst bed is closer to the top housing plate at the outlet end of

---

1955), *cert. denied* 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1955).

**126.** 1 Deller's Walker on Patents § 69, p. 325–26 (1964).

**127.** *Allen v. W. H. Brady Co.,* 508 F.2d 64, 67 (7th Cir. 1974).

**128.** See Finding of Fact B(21).

**129.** See Appendix D. Although public disclosure of the CM–714 converter occurred before January 7, 1971, it did not become meaningful until that date. Accordingly, January 7, 1971 will be treated as both the invention date and the public disclosure date of the CM–714 converter.

the converter than it is at the inlet end of the converter.[130] The teachings of each pertinent prior art reference will be analyzed separately.

The CM–714 converter [131] teaches two of the elements disclosed by the disputed claims of the '041 patent. First of all, the CM–714 converter teaches vertical extension of the housing plates and retainer plates immediately inboard of their flanges. Put otherwise, both the CM–714 converter and the '041 patent disclose two-layer vertical walls. In addition, the CM–714 converter teaches angling of the retainer plates inside the housing plates in order to ensure even distribution of entering exhaust gas.

The two remaining teachings of the '041 patent are hinted at in the CM–714 converter, even though they are not specifically taught by it. For example, only the bottom retainer plate of the CM–714 converter extends into the inlet and outlet of the converter, whereas both retainer plates have such extensions in the '041 patent. Likewise, only the flange of the bottom retainer plate in the CM–714 converter extends longitudinally and laterally to form an edge with the flanges of the housing plates, whereas both flanges of the retainer plates are sandwiched between the flanges of the housing plates in the '041 patent.

In a limited way, Fessler '142 [132] also hints at, rather than teaches, creation of a four-layer periphery. Concededly, the flanges of the retainer plates in Fessler '142, like those in the '041 patent, extend into an interstice formed by the flanges of the housing plates. However, unlike the '041 patent, the retainer plate flanges of Fessler '142 do not extend longitudinally as well as laterally. Moreover, the lateral extension of the retainer plate flanges to a space between the flanges of the housing

plates is not intended to permit the permanent sealing of the housing plates and retainer plates by one peripheral weld. Rather, Fessler intended that the catalyst bed remain loose so that it could adjust to temperature spikes to which the converter might be subjected.

By contrast, British '013 [133] teaches, rather than hints at, sandwiching the flanges of two intermediate plates between the flanges of two housing plates in order to create "a four-layer periphery suitable for edge affixation." Concededly, the outboard flanges of the intermediate plates in British '013 do not extend to the outside edge of the outboard flanges of the housing plates. However, the flanges on the intermediate plates extend longitudinally and laterally. Moreover, they extend far enough into the interstice between the flanges of the top and bottom housing plates so that a four-layer periphery, which is suitable for edge affixation, is formed.

Fessler '236 [134] teaches a different element of the '041 patent than does British '013. Like the '041 patent, the housing plates described in Fessler '236 assume a vertical orientation immediately inboard the peripheral edge which they form. Moreover, the analogy continues immediately inside the housing plates, for the peripheral wall of the catalyst bed abuts the vertical peripheral wall formed by the housing plates. Therefore, Fessler '236, like the '041 patent, teaches two-layer vertical peripheral walls.

Johnson '073 [135] also teaches one of the elements disclosed by the disputed claims of the '041 patent. In his patent, Johnson calls attention to the "uniquely canted or inclined catalyst bed which takes advantage of the variations in quantitative flow through the bed as the air proceeds longitu-

---

130. Exhibit 101. See claims 5 through 8.

131. Exhibit 113.

132. Exhibit 421.

133. Exhibit 420.

134. Exhibit 424.

135. Exhibit 201.

dinally over the converter"[136]. Admittedly, the inventors of the '041 patent used other language to describe the slanting catalyst bed incorporated in that design. Nevertheless, in design and purpose, the techniques described by the two patents are identical.

The same teaching is disclosed in the 1963 SAE article[137]. Several diagrams of prototype downflow catalytic converters appear throughout this article. Among these, Figure 27 is particularly noteworthy. Like the '041 patent, Figure 27 also clearly depicts a downflow converter with an inclined catalyst bed.

Scheitlin '925[138] likewise teaches the use of an inclined catalyst bed to improve flow distribution. According to the patent's specifications, the catalyst bed is to be mounted "diagonally within the shell [i. e., housing], so that the space between the inlet wall surface and the adjacent shell wall generally progressively decreas[es] in volume and the space between the outlet wall surface of said chamber [i. e., the catalyst bed] and the adjacent shell wall generally progressively increas[es] in volume from the end of the chamber adjacent the inlet conduit to the end of the chamber adjacent the outlet conduit."[139] For practical purposes, this specification is identical to the specification in the '041 patent which describes an inclined catalyst bed.

Finally, Patterson '255[140] neither hints at nor teaches any of the disputed elements of the '041 patent. The catalyst bed in Patterson '255 is parallel to the top and bottom housing plates rather than inclined; its catalyst container plates and its housing plates

form several edges rather than one; its inlet and outlet portions are formed by separate metal pieces rather than by the converter's housing and catalyst retainer plates; and the peripheral walls of its housing plates and the peripheral walls of its catalyst retainer plate are separate from one another.

In summary, the '041 patent is not simply a new combination of old elements[141]. Two-layer peripheral walls, an inclined catalyst bed, and a four-layer periphery suitable for welding admittedly are old in the art. The CM–714 converter, Fessler '236, Johnson '073, the SAE article, Scheitlin '925 and British '013 prove this. However, extension of the retainer plates into the inlet portion of the housing plates so that incoming exhaust gas will be directed over *three* plates and under *one* plate, as well as extension of the retainer plates into the outlet portion of the housing plates so that outgoing exhaust gas will be directed over *one* plate and under *three* plates is a totally new concept.

### 4) *Level of Ordinary Skill in the Pertinent Art*

The last factual inquiry that is required before the validity of the '041 patent can be determined is identification of the level of ordinary skill in the art which is pertinent to the '041 patent. This inquiry, unlike the previous ones, defines the method which an average inventor in the pertinent art would use to resolve a problem rather than data which might be important in that methodology[142].

136. Id. at p. 1.

137. Exhibit 423.

138. Exhibit 425.

139. ·Id. at p. 1.

140. Exhibit 227.

141. A combination patent is one in which: [n]one of the parts referred to are new, and none are claimed as new; nor is any portion of the combination less than the whole claimed as new, or stated to produce any given result. The end in view is proposed to be accomplished by the union of all, arranged

and combined *together in the manner* described. As this combination, composed of all the parts mentioned in the specification, and arranged with reference to other parts of the [machine] in the manner therein described, is stated to be the improvement, and is the thing patented. *Prouty v. Ruggles*, 16 Pet. 336, 341, 10 L.Ed. 985 (1842), cited in *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 520–21, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972).

142. Expressed differently, identification of level of ordinary skill is comparable to identification of the variables of a formula. Alternatively, identification of the scope, content and teachings of the pertinent prior art is comparable to

■ · Determination of the level of ordinary skill in the pertinent art is a two-step process. First, ". . . the body of people who devote regular and substantial effort to solving the type of problem [that] the alleged invention solves . . ." must be identified [143]. Second, the level of skill of an ordinary member of that group must be determined. Each subinquiry will be treated separately [144].

#### i) *Identification of Group to Which Person of Ordinary Skill Belongs*

Identifying the group of people to which the inventor of a patent-in-suit belongs is really tantamount to identifying the scope of art which is pertinent to the subject matter of a patent-in-suit. Both inquiries have the same focus in that they seek to define concepts by isolating the problem which a patent-in-suit allegedly solves [145].

Under this standard, only designers of techniques for *sealing* a container within a container in order to produce a specified flow should be considered in connection with the '041 patent. This conclusion is supported by the prior discussion concerning the scope of art which is pertinent to the subject matter of the '041 patent [146]. As was explained there, the chief problem confronted by the inventors of the '041 patent was how to eliminate exhaust gas bypass of the inner chamber of the converter due to leakage between the outer container of the converter and the inner container of the converter.

#### ii) *Determination of Skill of Member of That Group*

■ ■ Assuming that the group of people to which the inventor of a patent-in-suit belongs can be identified, two types of evidence have been admitted to prove the level of skill of an ordinary member of that group. The first type of evidence consists of examples of approaches taken by practitioners, other than the inventor of the patent-in-suit, to solve the problem which the patent-in-suit allegedly solves (example evidence) [147]. The second type of evidence is that which reveals the ". . . characteristics of a person of ordinary skill . .." (character evidence) [148].

■ Example evidence can be divided into at least three types. First, there is evidence that others in the pertinent art failed to solve the problem which the patent-in-suit allegedly solves [149]. Second, there is evidence of divergent solutions to the problem which the patent-in-suit allegedly solves [150]. Finally, there is evidence that others solved the problem which the patent-in-suit allegedly solves at about the same time that the patent-in-suit was invented [151].

■ These types of evidence are not probative of level of skill. The inquiry into level of ordinary skill focuses on identification of *how* an average practitioner in the pertinent art would reason if given a problem (i. e., the motivations, methodologies, and predispositions which an average practitioner would bring to bear on the problem). Absent this information, it would be

---

identification of the coefficients of those variables.

**143.** *Erie Technological Prod., Inc. v. Die Craft Metal Prod., Inc.*, 461 F.2d 5, 8 (7th Cir. 1972).

**144.** *Erie, supra*; *Systematic Tool & Machine Co. v. Walter Kidde & Co.*, 555 F.2d 342, 352 (3d Cir. 1977).

**145.** See *Erie*, and notes 6–7 accompanying text *supra*.

**146.** See notes 8–10 and accompanying text *supra*.

**147.** *Systematic Tool, supra*.

**148.** White, "Obviousness and the Level of Ordinary Skill," P.L.I. *1975 Patent Law Workshop*, p. 179.

**149.** P.L.I., *supra*.

**150.** *Erie Technological Prod., Inc. v. Die Craft Prod., Inc.*, 318 F.Supp. 933, 950 (N.D.Ill.1970).

**151.** *Shanklin Corp. v. Springfield Photo Mount Co.*, 521 F.2d 609, 618–19 (1st Cir. 1975); *International Glass Co. v. United States*, 408 F.2d 395, 187 Ct.Cl. 376 (1969); *Servo Corp. of America v. General Electric Co.*, 337 F.2d 716 (4th Cir. 1964); *Package Devices, Inc. v. Sun Ray Drug Co.*, 301 F.Supp. 768 (E.D.Pa.1969).

impossible to discriminate between obvious and nonobvious inventions because there would not be a hypothetical ordinary paradigm or process to use to predict the conclusion which an ordinary practitioner would reach if he were given a problem and pertinent prior art references. By contrast, example evidence shows *what conclusion* an average practitioner would reach after applying ordinary reasoning. Put otherwise, it identifies the ultimate outcome of an obviousness inquiry rather than one of the essential factors in that inquiry.

■ Like example evidence, character evidence may be divided into types. The first type is evidence of general information which would have been possessed by an ordinary practitioner in the pertinent art. In this regard, inquiries into the educational background of practitioners and into the depth and breadth of their experience in the pertinent art are appropriate [152]. Alternatively, the second type of character evidence identifies the normal work activity of the ordinary practitioner at the time of invention of the patent-in-suit [153]. It is evidence of work habit or work routine.

■ Unlike example evidence, character evidence is highly probative of level of skill. By providing evidence of the predispositions, motivations, methodologies and work routine of practitioners in the pertinent art, character evidence enables a court to construct a hypothetical ordinary paradigm which can be used to identify obvious outcomes to problems. Thus, character evidence, as contrasted with example evidence, identifies a *reasoning process* rather than the outcome of that process. Accordingly, it alone will be considered.

The character evidence which was introduced suggests that an inventor of ordinary skill in the art which is pertinent to the '041 patent has two attributes. First of all, he is an automotive parts designer who is intimately familiar with general mechanical

engineering techniques. In other words, he is a technologist of long experience rather than a scientist. Secondly, he knows how to design mechanical parts so that they can be produced economically and added to existing equipment without requiring modification of other parts. Accordingly, an ordinary inventor in the art which is pertinent to the '041 patent would have brought basic mechanical engineering techniques, as well as principles of production economy, to bear upon the problem which the '041 patent allegedly solves [154].

### 5) Formulation of Conclusion of Law Concerning Obviousness of '041 Patent

Formulation of a conclusion of law about the obviousness of the '041 patent in light of the preceding findings of fact involves four steps. First, the party who bears the burden of persuasion must be identified. Second, the amount of proof needed to carry the burden of persuasion must be identified. Third, it must be determined whether the party with the burden of persuasion has carried its burden under the technical obviousness analysis prescribed in *Graham v. John Deere*. Finally, if the outcome under the technical analysis is close, nontechnical indicia of obviousness must be examined.

### i) Identification of Party with Burden of Persuasion

■ The first step in formulating a conclusion of law about the obviousness of the '041 patent is assignment of the burden of persuasion. Although identification of the party who bears the burden of persuasion is meaningless whenever the evidence clearly indicates a result, it is essential for resolution of cases in which the evidence is evenly balanced. In the latter situation, it is the party with the burden of persuasion who loses [155].

---

**152.** *Systematic Tool, supra*; *Shanklin, supra*; *Jacobson Bros., Inc. v. United States*, 512 F.2d 1065 (Cust. & Pat.App.1975).

**153.** P.L.I., *supra*.

**154.** See Finding of Fact B(4).

**155.** 18 A.L.I. Proceedings 226.

### a) Applicable Law

■ In this circuit, the plaintiff-patentee has the burden of persuasion on the validity issue in a patent infringement action[156]. Since only a valid patent can be infringed, a patentee implicitly asserts the validity of his patent when he sues for the infringement of it. Therefore, the patentee assumes the burden of persuasion on the validity issue because he is trying to change the status quo[157].

### b) Application of Law to Present Case

■ Under this rationale, General Motors bears the burden of persuasion. It brought the infringement action which has placed the validity of the '041 patent in question. Therefore, it has the burden to persuade the Court that a practitioner of ordinary skill in the art which is pertinent to the '041 patent would not have invented the '041 patent if he were aware of both the problem which it allegedly solves and the pertinent prior art references.

### ii) Identification of the Degree of Proof Needed to Sustain Burden of Persuasion

The second step in formulating a conclusion of law about the obviousness of the '041 patent is identification of the amount of proof which the party bearing the burden of persuasion must adduce to meet his burden. Since a patent infringement action is a civil proceeding, the question boils down to whether the patentee must establish the validity of his patent by a preponderance of evidence or by clear and convincing evidence.

### a) Applicable Law

This is a question of first impression. Although courts have established the amount of proof which must be adduced by the defendant in an infringement action in order to rebut a presumption of validity and thereby meet his burden of going forward[158], they have not quantified the burden of persuasion. Accordingly, any decision on this issue must rest upon policy considerations rather than upon precedent.

■ In the absence of precedent, the likelihood that the *type of allegation* made by the party with the burden of persuasion is true controls how much proof must be adduced to meet that burden[159]. Put more precisely, there is an inverse relationship between the likelihood that the *type of claim*, as opposed to the particular claim, which the burden-bearer is alleging is true and the degree of persuasiveness which will be demanded. Thus, if it is unlikely that a type of allegation can be supported, clear and convincing evidence will be required to meet the burden of persuasion. Conversely, if it is likely that a type of allegation can be supported or if the risk cannot be estimated, a preponderance of evidence will meet the burden of persuasion.

### b) Application of Law to Present Case

■ Under this rationale, General Motors has a low burden of persuasion. Viewed collectively, validity allegations are more likely to be true than false. Unlike other types of allegations, validity allegations must withstand at least one review before they are tested in an infringement

---

**156.** *Dickstein v. Seventy Corp.*, 522 F.2d 1294 (6th Cir. 1975); *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 713 (6th Cir. 1975), *cert. denied* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303 (1976); *Deere & Co. v. Sperry Rand Corp.*, 513 F.2d 1131 (9th Cir. 1975).

**157.** McCormick, *Evidence* § 337 (2d Ed.) p. 786.

**158.** *Chicago Rawhide Mfg. Co. v. Crane Packing Co.*, 523 F.2d 452 (7th Cir. 1975); *Jack Winter, Inc. v. Koratron Co., Inc.*, 375 F.Supp. 1 (N.D.Cal.1974).

**159.** *Milonczyk v. Farmers' Mut. Fire Ins. Co.*, 200 Wis. 255, 227 N.W. 873; *Ziegler v. Hustisford Farmers' Mut. Ins. Co.*, 238 Wis. 238, 298 N.W. 610 (1941).

Although some cases have emphasized potential personal hardship to the defendant if the plaintiff were to succeed as a determinant in assigning the requisite degree of proof, such a standard would appear inapplicable in cases in which the judgment would not affect either personal reputation or personal freedom. See *Woodby v. Immigration Ser.*, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966).

action. Moreover, that review is conducted by patent law experts. Accordingly, a patentee who brings an infringement action should have to adduce only a preponderance of evidence in order to carry his burden of persuasion on his implicit validity claim.

### iii) Determination of Whether Burden of Persuasion Has Been Sustained Under Technical Obviousness Analysis

The third step in formulating a conclusion of law about the obviousness of the '041 patent is determining whether the burden of persuasion has been met under the technical obviousness analysis prescribed in *Graham v. John Deere*[160]. Put more precisely, has General Motors established by a preponderance of the evidence that a practitioner of ordinary skill in the pertinent art would not have developed the same solution developed by the inventors of the '041 patent, if he or she were given knowledge both of the problem which the '041 patent allegedly solves and of the pertinent prior art references?

### a) Meeting of Burden of Persuasion by Meeting Burden of Going Forward—Presumption of Validity

■ The first method which a patentee can use to sustain his burden of persuasion is to rely exclusively upon a rebuttable presumption of law that all issued patents are novel, useful and nonobvious[161]. The initial effect of this presumption of validity is to shift the burden of going forward on the issue of obviousness to the defendant[162].

However, if the defendant fails to adduce sufficient evidence to rebut this presumption, an additional effect is to end the case in the patentee's favor.

### 1) Applicable Law

■ The presumption of validity is triggered very easily. It is predicated upon the assumption that patent examiners correctly perform their official duty of evaluating the patentability of inventions[163]. Therefore, a patentee only needs to establish that he has an issued patent in order to enjoy the salutary presumption of law that the patent is nonobvious.

■ The amount of proof which a defendant must adduce in order to rebut the presumption of validity varies directly with the quality of the pertinent prior art which was reviewed by the PTO during the prosecution of the patent-in-suit[164]. The rationale for this sliding-scale of proof is the diminished probability that the PTO's determination is correct where its information is shown to have been deficient. Thus, if the PTO reviewed all of the pertinent prior art, the defendant must introduce clear and convincing evidence of obviousness in order to rebut the presumption of validity. Alternatively, if the PTO only reviewed a portion of the pertinent prior art, the presumption of validity may be rebutted either by a preponderance of evidence suggesting obviousness or by a lesser degree of proof, depending upon the pertinency of the prior art which was not reviewed by the PTO in comparison with the prior art which was reviewed by the PTO.

---

**160.** Since the '041 patent is not a combination patent (See note 141 and accompanying text *supra*), the Court need not determine whether the '041 produces a synergistic effect in addition to being technically nonobvious. See *Sakraida v. Ag. Pro., Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Anderson's-Black Rock v. Pavement Co.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

**161.** Section 282 states that:
A patent shall be presumed valid. Each claim of a patent (whether independent, in dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid

even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

**162.** See *Dickstein, supra*; *Sperberg, supra*; *Lorenz v. F. W. Woolworth Co.*, 305 F.2d 102, 105–06 (2d Cir. 1962).

**163.** 9 Wigmore on Evidence § 2534.

**164.** *American Seating v. National Seating*, 586 F.2d 611 (6th Cir. 1978); *Tee-Pak, Inc. v. St. Regis Paper Co.*, 491 F.2d 1193, 1196 (6th Cir. 1974); *Compare Campbell v. Spectrum Automation Co.*, 513 F.2d 932 (6th Cir. 1975).

### 2) *Application of Law to Present Case*

General Motors cannot sustain its burden of persuasion by relying exclusively upon the presumption of validity which initially attached to the '041 patent. Although this presumption shifted the burden of going forward on the obviousness issue from General Motors to Toyota, Toyota rebutted that presumption by adducing more than a preponderance of evidence which suggests that the invention embodied in the '041 patent would have been obvious to an ordinary practitioner in the pertinent art in February, 1971.

After General Motors triggered the presumption of validity by introducing the '041 patent, Toyota assumed a very low burden of going forward with evidence of obviousness to rebut that presumption. It is apparent from the findings of fact that the PTO not only did not have all of the pertinent prior art before it during the prosecution of the '041 patent [165], but also did not have the most pertinent prior art before it during those proceedings. Neither the CM–714 converter, nor British '013 were reviewed by the PTO [166]. Since the amount of proof needed to rebut the presumption of validity varies directly with the pertinency of the prior art reviewed by the PTO and since the most pertinent prior art was not reviewed by the PTO, it follows that Toyota only needed to adduce some evidence of obviousness to rebut the presumption of validity, rather than a preponderance of evidence of obviousness or clear and convincing evidence of obviousness.

Toyota has met this burden. Assuming that a hypothetical ordinary practitioner in the art which is pertinent to the '041 patent were presented with the problem of designing a downflow catalytic converter which would not leak exhaust gas between the inner container and the outer container of the converter, clear and convincing evidence exists that he or she would have developed the invention contained in the disputed claims of the '041 patent. First of all, the evidence establishes that the hypothetical practitioner would have applied conventional mechanical engineering techniques and product streamlining techniques in designing a catalytic converter. Secondly, the evidence establishes that he also would have been aware that an economical and durable method for creating a chamber within a chamber is to combine two identical housing plates with two identical inner plates, all four of which form a common edge suitable for welding (British '013). Finally, the evidence establishes that he would have been aware that a rather successful method for preventing leakage between the inner container and the outer container in a downflow catalytic converter is to combine identical top and bottom housing plates, which have semicylindrical outlet and inlet extensions and which have peripheral flanges, with a bottom retainer plate, which has a semicylindrical inlet extension that mates with the semicylindrical inlet extension of the bottom housing plate and a semicylindrical outlet extension which mates with the semicylindrical outlet extension of the top housing plate and which also has a peripheral flange, and a top retainer plate which does not have extensions or a peripheral flange which extends laterally between the flanges of the other plates (CM–714). With such techniques and with such prior art references, it is easy to conclude that a person of ordinary skill in the art would have been induced by his penchant for streamlining to apply the teachings of British '013 to the CM–714 and make the top retainer plate of the CM–714 identical to the bottom retainer plate.

### b) *Meeting the Burden of Persuasion with Unpresumed Evidence*

### 1) *Applicable Law*

Even though the defendant in an infringement action rebuts the presumption of validity which initially attached to the patent-in-suit, the patentee theoretically still can sustain his burden of persuasion. Put very simply, the patentee can prevail

---

**165.** Compare Section A(2) of Opinion and Finding of Fact B(22).

**166.** Compare Section A(3) of Opinion and Finding of Fact B(22).

on the strength of unpresumed rebuttal evidence. However, this method of proof is available only when the defendant can rebut, and does rebut, the presumption of validity with less than a preponderance of evidence.

### 2) Application of Law to Present Case

General Motors cannot sustain its burden of persuasion under this theory. Although Toyota technically only had to adduce some evidence that the '041 patent is an obvious advancement over the pertinent prior art, it instead adduced clear and convincing evidence in support of that conclusion of law. By providing such a high degree of proof, Toyota not only carried its burden of going forward by rebutting the presumption of validity, but also eliminated any further possibility that General Motors could sustain its burden of persuasion.

### iv) Effect of Nontechnical Indicia of Obviousness

The fourth step in formulating a conclusion of law about the obviousness of the '041 patent is determining whether nontechnical factors should be considered in evaluating obviousness. Put otherwise, should evidence of professional acceptance, commercial success, failure of others to produce the same invention, and simultaneous invention (secondary considerations) be considered in evaluating the obviousness of the '041 patent?

### a) Applicable Law

■ The Supreme Court and the Sixth Circuit have endorsed district court reliance upon secondary considerations to determine obviousness. Unlike the technical obviousness analysis prescribed in *Graham v. John Deere*, secondary considerations are nontechnical signals of obviousness. Thus, they provide a scientifically unsophisticated judge with some very manageable criteria of obviousness.

■ However, secondary considerations may not be used in all cases. In the Sixth Circuit, they may be considered only if the outcome under the technical obviousness analysis is in doubt. Thus, "(a)lthough in a close case secondary factors may tip the scales toward patent validity, they cannot save a patent from invalidity when . . . obviousness is clear." [167]

### b) Application of Law to Present Case

■ Secondary considerations need not be taken into account in the present case. The similarity between the pertinent prior art and the '041 patent leaves very little room to question the conclusion that the '041 patent is invalid under the technical obviousness analysis. Therefore, evidence that Toyota copied the '041 patent, that it was unable to produce a similar invention despite equivalent effort, and that the '041 patent was commercially successful cannot save the '041 patent. By the same token, evidence that a similar invention was developed by another entity before the '041 patent was invented cannot be used to invalidate the '041 patent.[168]

### B) Unenforceability and Infringement of '041 Patent

■ Invalidation of the '041 patent for obviousness eliminates any need to examine either General Motors' infringement allegations or Toyota's unenforceability contention. Circuit law reflects common sense in this regard. Since only rights raise duties, elimination of a right against infringement of an invention destroys the corresponding duty not to breach that erstwhile right.[169] Likewise, elimination of a right eliminates any need to avoid its enforcement because of the erstwhile right holder's fraudulent behavior.

### III

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this action, 28

---

167. *American Seating, supra* at 662.

168. See Exhibit 419.

169. *Minnesota Mining and Mfg. Co. v. Norton Co.*, 280 F.Supp. 674, 694 (N.D.Ohio 1967), *aff'd* 426 F.2d 1117 (6th Cir. 1970).

U.S.C. § 1338(a); Ohio Rev.Code § 2307.382. Moreover, venue is proper in this District, 28 U.S.C. §§ 1391(d) and 1400(b).

■ 2. Claims five (5) through eight (8) of the '041 patent are invalid for obviousness, 35 U.S.C. § 103.

3. Because claims five (5) through eight (8) of the '041 patent are invalid, General Motors' infringement allegations and Toyota's unenforceability allegations need not be examined, *Minnesota Mining & Manufacturing Co. v. Norton Co.,* 280 F.Supp. 674, 694 (N.D.Ohio 1967), aff'd 426 F.2d 1117 (6th Cir. 1970).

■ In view of the circumstances surrounding this case, each party should pay its own costs and attorneys' fees. Although Toyota has been relieved of an obligation to pay royalties to General Motors for Toyota's use of an analog of the '041 patent, it does not seem appropriate for General Motors to pay Toyota for establishing a right to use General Motors' work-product. Such a result would be inequitable.[170]

---

170. *Lichter Foundation, Inc. v. Welch,* 269 F.2d 142 (6th Cir. 1959).

1178

Upper Housing (Top) Plate

Upper Catalyst Retaining (Intermediate) Plate

Lower Catalyst Retaining (Intermediate) Plate

Lower Housing (Bottom) Plate

Relevant Elements Of Patented Converter

Outlet

Upper Catalyst Retaining (Intermediate) Plate

Lower Catalyst Retaining (Intermediate) Plate

Upper Housing (Top) Plate

Lower Housing (Bottom) Plate

Inlet

Relevant Elements Of Patented Converter

*PLAN VIEW*

*CROSS-SECTION ON 2-2*

*INLET*

*OUTLET*

UPPER HOUSING (TOP) PLATE

UPPER CATALYST RETAINING (INTERMEDIATE) PLATE

LOWER HOUSING (BOTTOM) PLATE

LOWER CATALYST RETAINING (INTERMEDIATE) PLATE

*INLET END ON 3-3*

*OUTLET END ON 4-4*

TOP PLATE

UPPER INTERMEDIATE PLATE

LOWER INTERMEDIATE PLATE

BOTTOM PLATE

*RELEVANT ELEMENTS OF PATENTED CONVERTER*

Appendix B

Upper Housing (Top) Plate

Upper Catalyst Retaining (Intermediate) Plate

Lower Catalyst Retaining (Intermediate) Plate

Lower Housing (Bottom) Plate

*Relevant Elements Of Toyota Converter*

1182

RELEVANT ELEMENTS OF TOYOTA CONVERTER

PLAN VIEW

CROSS-SECTION ON 2-2

UPPER HOUSING (TOP) PLATE

UPPER CATALYST RETAINING (INTERMEDIATE) PLATE

INLET

OUTLET

LOWER HOUSING (BOTTOM) PLATE

LOWER CATALYST RETAINING (INTERMEDIATE) PLATE

INLET END ON 3-3

OUTLET END ON 4-4

TOP PLATE

UPPER INTERMEDIATE PLATE

BOTTOM PLATE

TOP PLATE

LOWER INTERMEDIATE PLATE

BOTTOM PLATE

RELEVANT ELEMENTS OF TOYOTA CONVERTER

## Appendix C₁

POSSIBLE SCENARIOS UNDER SUBDIVISIONS a, b, e,
AND g OF SECTION 102, WHERE THE ASSERTED REFERENCE
IS A PATENT OR PATENT APPLICATION

| | | Invention Date of Patent-in-Suit | Application Date of Patent-in-Suit | Issuance Date of Patent-in-Suit | |
|---|---|---|---|---|---|
| 1 | 1*, 2**, 3*** | | | | |
| 2 | 1, 2 | 3 | | | |
| 3 | 1, 2 | | 3 | | |
| 4 | 1, 2 | | | 3 | |
| 5 | 1, 2 | | | | |
| 6 | 1 | 2, 3 | | | |
| 7 | 1 | 2 | 3 | | |
| 8 | 1 | 2 | | 3 | |
| 9 | 1 | 2 | | | |
| 10 | 1 | | 2, 3 | | |
| 11 | 1 | | 2 | 3 | |
| 12 | 1 | | 2 | | |
| 13 | 1 | | | 2, 3 | |
| 14 | 1 | | | 2 | |
| 15 | | 1, 2, 3 | | | |

*
This numeral signifies the invention date of the reference patent.

**
This numeral signifies the application date of the reference patent.

***
This numeral signifies the issuance date of the reference patent.

Example: Row one (1) describes a reference patent which was invented, applied for and issued before the invention date of the patent-in-suit.

## Appendix C$_2$

POSSIBLE SCENARIOS UNDER SUBDIVISIONS a, b
AND g OF SECTION 102 WHERE THE ASSERTED REFERENCE
IS NOT A PATENT OR PATENT APPLICATION

| | Invention Date of Patent-in-Suit | Application Date of Patent-in-Suit | Issuance Date of Patent-in-Suit | |
|---|---|---|---|---|
| 1 | 1*, 3** | | | |
| 2 | 1 | 3 | | |
| 3 | 1 | | 3 | |
| 4 | 1 | | | 3 |
| 5 | 1 | | | |
| 6 | | 1, 3 | | |

\*
This numeral signifies the invention date of a reference other than a patent.

\*\*
This numeral signifies the public disclosure date of a reference other than a patent.

Example: Row one (1) describes a reference which was invented and publicly disclosed before the invention date of the patent-in-suit.

## Appendix D

CHRONOLOGICAL DESCRIPTION OF PRIOR ART
WHICH IS PERTINENT TO THE '041 PATENT

| | Invention Date of '041 Patent (2/7/71) | Application Date of '041 Patent (9/7/71) | Issuance Date of '041 Patent (12/3/74) |
|---|---|---|---|
| Patterson '255 | 1 (?)*<br>2 (5/19/70)** | 3 (10/26/71)*** | |
| Fessler '142 | 1 (?)<br>2 (9/22/69) | 3 (8/17/71) | |
| Fessler '236 | 1 (?) | 2 (2/19/71) | 3 (11/7/72) |
| Scheitlin '925 | 1 (?)<br>2 (9/14/61)<br>3 (9/22/64) | | |
| British '013 | 1 (?)<br>2 (1/8/48)<br>3 (11/15/49) | | |
| SAE Article | 1 (?)<br>3 (3/12/62) | | |
| Johnson '073 | 1 (?)<br>2 (8/12/60)<br>3 (8/25/64) | | |
| CM-714 | 1 (1/7/71)<br>3 (1/7/71) | | |

*This numeral signifies the invention date of the reference.

**This numeral signifies the application date of the reference patent.

***This numeral signifies the issuance date of the reference patent or the publication date of references other than patents.