**GENERAL MOTORS CORPORATION,**
Plaintiff,

v.

**TOYOTA MOTOR COMPANY,**
LTD., Defendant.

No. C–3–76–228.

United States District Court,
S.D. Ohio, W.D.

On Remand May 12, 1982.

Reconsideration of Validity Denied
Aug. 1, 1983.

Gilbert N. Henderson, Biebel, French &
Nauman, Dayton, Ohio, Frederick M. Rit-
chie, G.M.C. Patent Section, Detroit, Mich.,

George Frost, Ronald Phillips, Detroit, Mich., for plaintiff.

Paul J. Winterhalter, Pickrel, Schaeffer & Ebeling, Dayton, Ohio, Arthur Gray & Hugh Chapin, Kenyon & Kenyon, New York City, for defendant.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

CARL B. RUBIN, Chief Judge.

This matter is before the Court on evidence presented to this Court in November and December, 1977, and upon the parties' post-remand briefs.

A brief review of the procedural history of this case is useful. This action was brought by General Motors Corporation (General Motors) against Toyota Motor Company, Ltd., Toyota Motor Sales Co., Ltd. and Toyota Mid-America Distributors, Inc., (Toyota) in 1976, alleging that Toyota had infringed claims five (5) through eight (8) of United States Patent 3,852,041 (041 patent). Toyota defended on the grounds of patent invalidity and non-infringement. All issues were tried to the Court in November and December of 1977, and in February of 1979, this Court ruled that the claims of the patent in question were invalid due to obviousness. Accordingly, the Court did not reach the issue of infringement. *General Motors Corp. v. Toyota Motor Co. Ltd.,* 467 F.Supp. 1142, 1177 (S.D. Ohio 1979).

On appeal to the United States Court of Appeals for the Sixth Circuit, the Court held that the claims in question were not invalid for obviousness and remanded the case "for trial of the question of infringement." *General Motors Corp. v. Toyota Motor Co. Ltd.,* 667 F.2d 504 (6th Cir.1981). Subsequent to the remand, the parties agreed that the evidence presented in 1977 adequately covered the question of infringement and that a second trial was unnecessary. The parties have, however, submitted post-remand briefs addressed to the issue of infringement and reply memoranda

in support thereof. Accordingly, we turn to the issue of infringement, with references to this Court's prior decision and the Sixth Circuit's opinion where appropriate.

### I. Findings of Fact

The Court of Appeals reversed on the grounds that this Court improperly considered the CM–714, a catalytic converter developed "in-house" at General Motors, to be disabling prior art. 667 F.2d at 507. The Sixth Circuit also held that General Motors' previous sales of the CM–714 converter were not beyond the "experimental use" exception to the rule that sale of an invention constitutes public disclosure. *Id.* at 507–08.[1]

This Court's previously entered Findings of Fact as they bear upon the development and relevant features of both the patented General Motors converter and the Toyota converter, however, were essentially undisturbed by the Court of Appeals. *Id.* at 505. Accordingly, in addition to the following particularized findings, we incorporate by reference our prior Findings of Fact A(1)–(4), B(1)–(23) and C(1)–(7), attached hereto as Appendix A.

(A) *The Patented General Motors Converter:*

(1) The General Motors converter is depicted in exploded form in Figure 1a of Appendix B. It consists of two identically formed housing plates, a top housing plate and a bottom housing plate, and two catalyst retainer plates, a top catalyst retainer plate and a bottom catalyst retainer plate. The catalyst retainer plates are perforated to allow the exhaust gas to pass through them and come in contact with the catalyst bed contained therein.

(2) The top housing plate is of concave downward configuration and has a peripheral skirt portion and peripherally-spaced downwardly concave semi-cylindrical inlet and outlet portions. The bottom housing plate is of concave upward configuration

---

1. General Motors' petition for certiorari to the United States Supreme Court was denied on

April 19, 1982. 456 U.S. 937, 102 S.Ct. 1994, 72 L.Ed.2d 457 (1982).

and has a peripheral skirt portion and a pair of peripherally-spaced upwardly concave semi-cylindrical inlet and outlet portions. The top and bottom housing plates are complementary such that when they are placed together, they have mating peripheral edges and create a fully cylindrical inlet and outlet.

(3) The top catalyst retainer plate is upwardly concave and the bottom catalyst retainer plate downwardly concave so as to create a catalyst retaining space between them. The catalyst retainer plates also have peripheral portions complementary to and sandwiched between the peripheral portions of the top and bottom plates. Each of the catalyst retainer plates has a downwardly concave semi-cylindrical portion at the inlet end of the converter and an upwardly concave semi-cylindrical portion at the outlet. The retainer plates therefore nest with each other and the bottom housing plate at the inlet of the converter and with each other at the top housing plate at the outlet of the converter. A single external weld on each lateral side of the converter effectively seals both the inner catalyst chamber and the outer structure.

(4) A cross-section of the patented converter from side view is depicted in simplified form in Figure 2a of Appendix B. As indicated by arrows, exhaust gas flows into the inlet of the converter and is directed over three layers consisting of the top retainer plate, bottom retainer plate and bottom housing plate, and under one layer consisting of the top housing plate. The gas then flows through the catalyst retaining space before being released through the outlet. At the outlet, the gas passes under three layers consisting of the bottom retaining plate, top retaining plate and top housing plate, and over the single-layer bottom housing plate.

(5) Although not described in the patent claims, in practice, General Motors cuts back the end of the middle layer of the three-layer thickness at both the inlet and outlet of the converter. (See Figure 2a, Appendix B). The slight cutback is made from the bottom retaining plate at the inlet

of the converter and from the top retaining plate at the outlet. The purpose of these cuts is to alleviate the welding nuisance created at the outer edges of the inlet and outlet as a result of the three-over-one configuration. Once the cut in the middle layer is made inboard the edge, there is only a two-over-one configuration at each end of the converter and the necessary welding is thereby improved.

(B) *The Toyota Converter:*

(1) The Toyota converter is depicted in exploded form in Figure 1b of Appendix B. Like the patented converter, it consists of two identically-formed housing plates, and two catalyst retainer plates. The catalyst retaining plates are also perforated so that the gas will pass through them and come into contact with the catalyst contained therein.

(2) The housing plates utilized in the Toyota converter are essentially identical to those of the General Motors converter. Each housing plate has a peripheral skirt portion and concave semi-cylindrical inlet and outlet portions such that when placed together, they have mating peripheral edges and a fully cylindrical inlet and outlet.

(3) The catalyst retainer plates of the Toyota converter are slightly different from those in the patented converter. Although of the same basic overall configuration, the bottom catalyst retainer plate is cut back and does not extend fully into the inlet portion of the converter. Similarly, the top catalyst retainer plate is cut back on the opposite end and does not extend fully into the outlet portion of the converter. Although the two retainer plates seat against each other at either end of the converter, the shortened ends of the bottom retainer plate and top retainer plate do not extend to engagement with the respective housing plates at the inlet and outlet, respectively. Accordingly, although a single external weld on each lateral side of the converter will seal the outer catalyst housing, it will not seal the inner catalyst retainer chamber. In order to prevent attri-

tion of the catalyst, Toyota secures the shortened ends of the retainer plates to the corresponding extended retainer plate by means of internal spot welds.

(4) The Toyota converter has an additional feature not present in the patented converter. At the inlet end of the converter, Toyota adds an additional piece of metal, variously referred to as a "baffle" or flange, which serves to deflect the gases upward and to protect the top catalyst retainer plate.

(5) A cross-section of the Toyota converter from side view is depicted in simplified form in Figure 2b of Appendix B. As the exhaust gas enters the converter, it follows virtually the same flow path as the General Motors converter. Due to the shortened retainer plate at each end, however, the three plates over which the gas passes at the inlet end of the converter and the three plates under which it passes at the outlet end are not sandwiched together in the inlet and outlet portions of the converter. Instead, the middle layer is spot-welded somewhat upstream and downstream of either end. The configuration at the edge of both the inlet and outlet is therefore a two-over-one configuration.

## II. Opinion

### (A) Literal Infringement:

The initial inquiry in determining whether the Toyota catalytic converter infringes Patent 041 is whether there is literal infringement of the patent. This determination involves the comparison of the claim language of the patent with the accused device. If the accused device is clearly within the claims, there is infringement. *Graver Mfg. Co. v. Linde Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Acme Highway Products Corp. v. D.S. Brown Co.,* 473 F.2d 849, 850 (6th Cir.1973); *Armco, Inc. v. Republic Steel Corp.,* 707 F.2d 886 (6th Cir.1983). Conversely, a patent's claims cannot be extended beyond the teachings expressed in the patent. Minor modifications may be sufficient to avoid literal infringement. *Weldman Metal Masters v. Glass Master Co.,* 623 F.2d 1024, 1026

(5th Cir.1980); *quoted with approval in Vulcan, Inc. v. Fordees Corp.,* 658 F.2d 1106 (6th Cir.1981).

Although there are four claims of the patent involved in this litigation, the parties have essentially limited their arguments to Claims 5 and 6, apparently in agreement that any determination as to those two claims will also be determinative as to Claims 7 and 8. Claims 5 and 6 are set forth below:

5. A catalytic converter for automotive use comprising a four-plate sandwich construction that includes a top plate, a bottom plate and two intermediate plates, said top plate being of concave downward configuration and having a peripheral skirt portion and a pair of peripherally spaced downwardly concave semi-cylindrical inlet and outlet portions, said bottom plate being of concave upward configuration having a peripheral upstanding skirt portion and a pair of peripherally spaced upwardly concave semi-cylindrical inlet and outlet portions, the bottom plate being complementary to the top plate so as to form an enclosure having mating peripheral edges and full cylindrical inlet and outlet portions, said two intermediate plates also have peripheral portions complementary to and sandwiched between the peripheral portions of the top and bottom plates, one intermediate plate being upwardly concave and the other intermediate plate downwardly concave so as to define a catalyst retaining space there-between said intermediate plates being perforated at the catalyst retaining space to allow and require gases entering the inlet portion to pass through the catalyst retaining space and out the outlet portion, *both of said intermediate plates having a downwardly concave semi-cylindrical portion at the one end and an upwardly concave semi-cylindrical portion at the other end in nesting relation with the other and the top plate at said one end and with each other and the bottom plate at said other end.* (emphasis added)

6. A catalytic converter for automotive use comprising a four plate sandwich construction that includes a top plate, a bottom plate, and upper and lower catalyst retaining plates, *the plates being complementary to each other so as to define a four-layer periphery suitable for edge affixation to define a unitary structure,* the top plate and the bottom plate inboard the periphery defining an exhaust gas flow passage so that exhaust gas travels into the space between said plates at one peripheral point and out of such space at another peripheral point, *the upper and lower catalyst retaining plates being juxtaposed against each other and the top plate at one point in said flow passage so as to permit flow only underneath three layers formed by the top plate and the catalyst retaining plates and being juxtaposed against each other and the lower plate at another point in said flow passage so as to permit flow only over three layers formed by the bottom plate and the catalyst retaining plates,* whereby the two catalyst retaining plates define a barrier to direct flow through the converter, said catalyst retaining plates having vertically spaced portions between said one point in the flow passage and the other point in the flow passage defining a catalyst retaining space and being perforated to permit and require exhaust gas flowing through the converter to pass through the catalyst. (emphasis added)

Toyota argues that there is no literal infringement of Patent 041 because the patented converter and the Toyota converter differ in the following respects:

(a) Claim 5 describes both retainer plates as having semi-cylindrical portions at each end, whereas in the Toyota converter, each retainer plate has a semi-cylindrical portion at only one end.

(b) Claim 5 of the patent provides that both of the intermediate plates are in nesting relation with each other and the top housing plate at one end of the converter, and with each other and the bottom housing plate at the other end. In the Toyota converter, however, there is a nesting of only one of the retaining plates with the housing plate at each end of the converter.

(c) Toyota's catalyst retainer plates are not juxtaposed against each other and a housing plate at any *one point* so as to permit flow over or under three layers as described by Claim 6.

(d) Claims 5 and 6 require a four-layer periphery around the entire converter which can be sealed by a single weld. In the case of the Toyota converter, however, there is three-layer periphery around 40% of the converter.

(e) Claim 6 describes a four-layer periphery suitable for edge affixation to define a unitary structure. In the Toyota converter, however, internal spot welds are required to seal the inner catalyst retaining space. It is therefore impossible to achieve a unitary structure by edge affixation alone.

General Motors contends that when read with the liberality they deserve, Claims 5 and 6 read directly on the Toyota converter. In response to defendant's arguments, General Motors contends that the references to "concave semi-cylindrical portions" literally cover the rounded v-shape confirmation of the shortened ends of the Toyota retainer plates, and that the reference does not require a right, circular, semi-cylindrical portion. Similarly, General Motors asserts that the statements made in Claim 6 with respect to the retainer plates being "juxtaposed against each other and the top plate *at one point* in said flow passage" and "juxtaposed against each other and the lower plate at *another point* in said flow passage," should not be construed as limited to a mathematical point but interpreted to include an area or region.

▮ Where a claim or clause thereof is capable of two interpretations, the Court may resort to the description of the invention contained in the specifications and file history in order to determine the claim's meaning. *Paeco, Inc. v. Applied Moldings, Inc.,* 562 F.2d 870, 876 (3rd Cir.1977). Each of the party's experts in this case testified as to conflicting interpretations of the claim

language, specifically the references to "concave semi-cylindrical portions", and the retaining plates being "juxtaposed against each other and [the respective housing plate] at one point in said flow passage." Accordingly, we turn to the patent specifications and the file history for any assistance they may provide in electing between the alternative interpretations advanced by the parties herein.[2]

■ Upon examination of the accompanying specifications, it is apparent that both claims of the patent contemplate a converter where each retainer plate has a semi-cylindrical portion extending into the inlet and outlet. We refer specifically to the following statements contained therein.

At Column 2, line 5, the specifications state:

Another object of the present invention is to provide an improved catalytic converter suitable for use on automobiles and characterized in its construction by the use of four sheet metal members so organized and arranged that edge seals only serve to define both the catalyst holding beds and the air flow passages. (emphasis added).

As a result of Toyota's cut-off at one end of each catalyst retainer plate, edge seals only will not serve to define both the catalyst holding space and the air flow passages. It is undisputed that additional internal spot welds are required to achieve that result.

Attention is also called to a similar description contained in the specifications at Column 2, line 34:

The four plates having mating peripheral faces coterminous over substantially their

entire peripheries forming a four-layer sandwich suitable for edge sealing so as to define a sealed inlet plenum communicating with a cylindrical inlet at one end of the converter and a sealed outlet plenum communicating with the cylindrical outlet at the other end of the converter ... (emphasis added)

At Column 2, line 16, the specifications continue:

... the unit defining cylindrical inlet and outlet passages in spaced relationship and each such passage being defined by cooperating upwardly concave and downwardly concave portions, with one-plate thickness on one of such portions and three-plate thicknesses on the other of such portions of each passage so that the inner plates serve cooperatively to define a gas flow path requiring the exhaust gas to pass through the catalyst bed. (emphasis added)

The three-over-one configuration at each end of the patented converter is therefore clearly described in the specifications. In order to obtain such a three-over-one configuration, it is necessary to extend both ends of each catalyst retaining plate into the inlet and outlet. It is undisputed that the Toyota converter fails to extend one end of each retaining plate into the inlet and outlet. The result is a two-over-one configuration at each edge.[3]

We reach a similar conclusion with respect to the "juxtaposed against each other [and the respective housing plate] at one point" clause of Claim 6. The following language of the specifications clarifies the

---

2. Because the absence of a single element of a claimed invention will defeat an assertion of literal infringement, *Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95, 103 (6th Cir.1975); *Graphicana Corp. v. Baia Corp.*, 472 F.2d 1202, 1203 (6th Cir.1973); we have focused on those elements of the claims which appear to be the most critical in terms of the differences between the patented and accused converters.

3. The following paragraph in the specifications further supports Toyota's interpretation of the claims language (lines 48–59):

*The cylindrical inlet and outlet* are adapted to receive exhaust inlet and outlet pipes and *are defined in combination by like-positioned, concave, substantially semi-cylindrical peripherally-spaced portions of the four plates* wherein one opening is defined by a downwardly concave portion in the top housing plate, downwardly concave portions in both retaining plates and an upwardly concave portion in the bottom housing plate and the other opening is similarly defined by the housing plates but with upwardly concave portions in both retaining plates. (emphasis added)

type of juxtaposition contemplated by the patent:

"... at the inlet 56 the top retaining plate 26 and the bottom retaining plate 28 are both formed with *like-positioned semi-cylindrical concave up portions 68 and 70, respectively, adapted to mate with each other and with the concave up portion 66 of the bottom housing plate 14.* At the exhaust outlet, 58, the top retaining plate 26 and the bottom retaining plate 28 are both formed with *like-positioned semi-cylindrical concave down portions 72 and 74, respectively, adapted to mate with each other and with the concave down portion 64 of the top housing plate 12.*" Column 5 lines 27–38. (emphasis added)

The catalyst retainer plates in the Toyota converter do not "mate" with each other and the housing plate at any point in the inlet or outlet. Instead, only a single catalyst retainer plate is juxtaposed against the housing plate at each end. The other catalyst retainer plate is spot welded inboard the inlet and outlet. Unlike the General Motors converter, there is no single point where all these layers of the Toyota converter "mate" or are juxtaposed against each other.

It is clear that every element of a claim must be present in an accused device in order for it to infringe. The Toyota converter does not include retainer plates with semi-cylindrical portions extending into the inlet and outlet, or retainer plates which are juxtaposed against each other and the respective housing member at any point. Because we have found that the claims in question describe such extensions and relationship between the retaining plates, the Toyota converter does not read upon the patent claims and there is no literal infringement.

(B) *Doctrine of Equivalents:*

■ The second inquiry in an infringement case involves application of the doctrine of equivalents. The doctrine of equivalents recognizes infringement by an accused device despite the absence of literal infringement, where the two devices do the same work in substantially the same way, and accomplish substantially the same result. *Graver, supra* 339 U.S. at 608, 70 S.Ct. at 856; *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147 (1929). The Supreme Court in *Graver* defined equivalency in the following way:

What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other, and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the quality it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was. 339 U.S. at 609, 70 S.Ct. at 856.

■ The context of the patent, the prior art, and the particular circumstances in this case all support the conclusion that the Toyota converter infringes Patent 041 under the doctrine of equivalents.

The circumstances surrounding Toyota's development of the accused converter are strongly in General Motors' favor. Toyota had been unsuccessful in developing an effective catalytic converter prior to its observation of the General Motors converter at a public hearing before the Environmental Protection Agency. It is undisputed that a Toyota employee made a detailed sketch of the General Motors converter at that time and provided it to Toyota's research group in Japan. Toyota thereafter constructed the slightly modified version of General Motors converter identified previously. The

new Toyota construction performed satisfactorily in testing and avoided the problems Toyota experienced with its earlier converters. The circumstances thus indicate that Toyota relied heavily on the General Motors converter in arriving at its own design, and did not develop it independently. While the act of imitation or copying is not determinative of equivalency, it is evidence which the Court may consider as part of the patent's context. *See, Graver, supra* at 612, 70 S.Ct. at 858.

As we outlined in our previous decision, when the inventors of the 041 Patent initiated their research in 1969, the scope of the pertinent art was limited to techniques for sealing a container within a container in such a manner that an entering fluid would pass through an inlet chamber, an inner chamber and an outlet. 467 F.Supp. at 1158. With the exception of the in-house CM–714 converter, which the Sixth Circuit has held may not be considered pertinent prior art, none of the pertinent prior art references teach lateral extension of either or both of the retaining plates into the inlet or outlet. The patented converter represents a significant improvement over the prior art in this regard.

Extension of the retaining plates in the patented invention into the inlet and outlet results in a converter which requires fewer parts and also avoids the leakage problems encountered by prior art downflow converters. As is evident from the cross-section depiction of the converter, extension of the retaining plates into the inlet of the converter prevents exhaust gas from by-passing the catalyst retaining space. The positioning of the retaining plates at the inlet directs the exhaust gas over the catalyst retaining space and the gas must then pass through the catalyst retaining space before it is released through the outlet. Extension of the retaining plates into the outlet of the converter serves the related purpose of directing the gas flow out of the converter.

It is apparent from the cross-section depiction of the Toyota converter that it accomplishes the same result as the General Motors converter in essentially the same manner by extending only the top catalyst retainer plate into the inlet, and only the bottom catalyst retainer plate into the outlet. The positioning of these retainer plates *only* directs the gas flow in such a way as to eliminate the risk of the exhaust gas bypassing the catalyst. While the shortened ends of the corresponding lower and upper retainer plates in the Toyota converter do require additional internal spot welds in order to seal the catalyst retaining space, this fact in no way alters the way in which the converter functions.

Toyota's witness testified that the cost of additional internal welding was less than the cost which would be required to extend both retainer plates into the inlet and outlet, and that the cut-off of one end of each retaining plate also alleviates the welding nuisance at the rim of the inlet and outlet caused by a three-over-one configuration. While this may explain why Toyota did not duplicate exactly the patented converter, it does not alter the fact that the accused converter incorporates the innovative concept of the patent, i.e., extension of the retainer into the inlet and outlet. It may be recalled that in practice, General Motors also cuts off the middle retainer plate at each end for the same purpose, albeit to a lesser extent than in the accused device. The minor modification of the patent by Toyota was therefore equally apparent to General Motors.

The slight modification of the General Motors converter effected by Toyota in no way alters the essential features of the patented converter or the way in which it functions. Toyota devotes a great deal of its argument against equivalency to the fact that a single external weld will not seal the inner catalyst chamber of its converter, and the absence of a four-layer periphery around the *entire* accused converter. These features are, however, simply an inevitable consequence of Toyota's shortening of the middle retainer plate at each end of the converter. Once the necessary spot welds are made, a single external weld *will* seal the catalyst retaining space as well as the outer structure of the converter. Also,

there *is* a four-layer periphery around 60% of the accused converter. The three-layer periphery around the remaining 40% is only a result of Toyota's failure to extend both retainer plates into the inlet and outlet of its converter. The differences between the patented and accused converters in these respects are insignificant in terms of the manner in which the converters function or the results achieved by their basic design.[4]

The extension of the upper retainer plate into the inlet and the bottom retainer plate into the outlet is the basic concept of the patented converter. The Toyota converter clearly utilizes this basic design of Patent 041 and therefore infringes the patent under the doctrine of equivalents.

(C) *File Wrapper Estoppel:*

■ One additional issue in this infringement action requires discussion. A patentee may not utilize the doctrine of equivalents in order to broaden a claim to cover that which the patent office rejected. This concept is referred to as "file wrapper estoppel." The Supreme Court has described the principle of file wrapper estoppel as follows:

It is well settled that where an applicant for a patent to cover a new combination is compelled by the rejection of his application by the Patent Office to narrow his claim by the introduction of a new element, he cannot after the issue of his patent broaden his claim by dropping the element which he was compelled to include in order to secure his patent. . . . The patentee is thereafter estopped to claim the benefit of his rejected claim or such a construction of his amended claim as would be equivalent thereto. . . . So where an applicant whose claim is rejected on reference to a prior patent, without objection or appeal, voluntarily restricts himself by an amendment of his claim to a specific structure, having thus nar-

rowed his claim in order to obtain a patent, he 'may not by construction, or by resort to the doctrine of equivalents, give to the claim the larger scope which it might have had without the amendments which amount to a disclaimer.' (citations omitted).

*ITS Co. v. Essex Co.,* 272 U.S. 429, 443–44, 47 S.Ct. 136, 141, 71 L.Ed. 335 (1926).

■ Toyota argues vigorously that General Motors' actions before the Patent Office with respect to the various applications for Patent 041 and the initial rejection of Claim 6, preclude it from claiming infringement by the accused Toyota converter. Amendment of a claim in the Patent Office does not, however, automatically bar a patentee from invoking the doctrine of equivalents. The patentee is only estopped from reclaiming that which he has surrendered. *Ziegler v. Phillips Petroleum Co.,* 483 F.2d 858 (5th Cir.1973). The Court has carefully reviewed all of the pertinent communications between the patent office and General Motors in this case. We do not find any basis for a file wrapper estoppel with respect to the differences between the General Motors and Toyota converters.

In order for there to be a file wrapper estoppel, it must be shown that General Motors surrendered language in its claims which would have covered the accused device, i.e., a catalytic converter in which only the top catalyst retainer plate extends into the inlet, and only the bottom catalyst retainer plate extends into the outlet of the converter. After examining the file history, however, we can find no such language. Rather, all of the pertinent communications from General Motors to the patent office are consistent in their description of a catalyst converter where both catalyst retaining plates extend into the inlet and outlet portions of the converter.

---

4. Although Toyota also added an additional metal baffle or flange at the inlet of the converter, see I. (B)(4) *supra,* Toyota has not argued that this is a significant difference between the patented and accused converters. (Tr. at 1070). An accused device does not avoid infringement by adding features if it otherwise adopts the basic features of a patent. *Acme, supra* at 855; *Aluminum Co. of America v. Sperry Products, Inc.,* 285 F.2d 911 (6th Cir.1960).

Toyota argues that General Motors' original claims 5–8 (ultimately cancelled) which referred simply to "an exhaust gas inlet . . . and an exhaust gas outlet," were rejected based upon prior art, and that General Motors thereafter narrowed its claims to the present three-over-one configuration. This argument, however, ignores the fact that the original claims 5–8 were not even directed at the extended catalyst retainer. Instead, they focused upon construction of the top and bottom housing plates to include "at least one inwardly depressed portion." The Patent Office rejected these claims because the prior art taught this feature.

Claim 1 of the patent, however, *did* recite the extended catalyst retainer in a manner similar to the claims at issue herein, and it was accepted by the Patent Office from the outset. After cancelling its original claims 5–8, General Motors offered claims 9–12 (re-numbered 5–8), each of which recites the extended catalyst retainer in the language addressed herein. These claims were issued without amendment. The above actions by General Motors do not in any way involve a surrender of the breadth of any claims relating to the extended catalyst retainer.

The only rejection of any of the claims at issue herein involved Claim 6. The patent office initially rejected this claim based upon the Fessler 142 prior art patent. As we have already noted, however, the catalytic converter described in that patent did not include lateral extension of either retainer plate into the inlet or outlet of the converter. Consequently, the initial rejection of Claim 6 by the patent office could not have been due to any claim language arguably covering the Toyota construction.

Toyota's position that General Motors' arguments before the Patent Office in support of Claim 6 amount to an estoppel against the equivalent found herein is meritless. To accept such a position in this case would completely erode the doctrine of equivalents. By its arguments, General Motors was attempting to differentiate Claim 6 from a device which did not even utilize an extended catalyst retainer. The fact that it reiterated the three-over-one configuration and extension of both retainer plates at each end is of no greater consequence than its inclusion in those claims from the beginning.

One final consideration deserves some discussion. General Motors has repeatedly asserted that the claim language in Patent 041 and accompanying specifications, describing a catalytic converter where both retaining plates extend into the inlet and outlet of the converter, is consistent with its obligation to describe the invention in its "best mode." 35 U.S.C. § 112. General Motors extends both catalyst retaining plates into the inlet and outlet of the converter and as a result of those extensions, is able to seal both the inner and outer chambers of the converter with a single weld on each side. Toyota explained its deviation from that configuration based upon cost considerations: the cost of the additional metal required to extend each retaining plate exceeds Toyota's costs for the internal spot welding required to seal the inner catalyst chamber. The fact that General Motors' logic in assuming that it had described its invention in its "best mode" is not necessarily applicable to a manufacturer whose material and labor costs are different, should not bar it from asserting infringement by an equivalent device which has been otherwise established.

In summary, the novel aspect of the General Motors converter involves extension of the retaining plates into the inlet portion of the converter so that incoming exhaust gas is directed over the catalyst retaining space, and the similar extension of the retaining plates into the outlet portion of the converter so that outgoing exhaust gas is directed out of the converter. As a result of this design, the General Motors converter prevents exhaust from by-passing the catalyst. The Toyota converter's slightly modified configuration accomplishes the same result in essentially the same manner. The differences between the two converters are minimal and merely involves a choice of mechanical alternatives.

*III. Conclusions of Law*

(A) This Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1338.

(B) Claims five (5) through eight (8) of United States Patent No. 3,852,041 are infringed by the defendant's catalytic converter under the doctrine of equivalents.

(C) The prosecution history of United States Patent No. 3,852,041 does not bar application of the doctrine of equivalents to the accused Toyota converter.

IT IS SO ORDERED.

APPENDIX A

I

FINDINGS OF FACT

A. *General Background*

1. A catalytic converter is a device which reduces the concentration of pollutants in car engine exhaust. It operates by subjecting engine exhaust to a chemical reaction before the exhaust is emitted from the tailpipe, rather than by modification of the engine. (R. 196–98)

2. There are two basic types of catalytic converters. A Monolithic Catalytic Converter consists of a ceramic block with a labyrinth of catalyst-coated channels throughout its length. Catalysis occurs by the passage of exhaust gas through these channels. By contrast, a Downflow Catalytic Converter, like the one described by the '041 patent, consists of an inlet chamber, an inner chamber in which catalyst-coated ceramic pellets are contained, and an outlet chamber. Catalysis occurs by the passage of exhaust gas into the inlet chamber, downward through the inner chamber, and out through the outlet chamber. (R. 192–95)

3. Initial interest in catalytic converters was regional and short-lived. The first converters were developed in the early sixties in response to California's stringent car emission standards. However, catalytic converter development ended in the middle of that decade because of converter failure from fuel contamination and structural deformity at high temperatures. (R. 207–08)

4. The spectre of national legislation requiring the cleansing of car exhaust and the introduction of unleaded gasoline as an automobile propellant rekindled interest in catalytic converters in the late sixties. Since it was known generally that a catalytic converter will operate efficiently only if an engine burns unleaded fuel, the automobile industry's switch to unleaded fuel in 1969 transformed catalytic converters into a viable means for achieving the proposed national emissions standards. Put simply, the proposed legislation set a goal and the decision to use unleaded fuel made catalytic converters a practical means of achieving that goal. (R. 199–200; 205–06. Exhibit 416 at H00021)

B. *General Motor's Experience*

1. General Motors is incorporated in Delaware and has its principal place of business in Michigan. It is the largest manufacturer of motor vehicles in the United States.

2. In late 1969, General Motors divided responsibility for development of a catalytic converter among three groups. Both a Catalyst Group and a Catalyst Container Group were created at a General Motors' AC Spark Plug Division (AC Spark Plug). In addition, an Applications Group was created at General Motors' Oldsmobile Division. The first group was charged with identifying an appropriate metal to produce the catalytic reaction; the middle group was charged with developing a structure to contain the catalytic reaction; and the latter group was charged with placing the catalytic converters designed by AC Spark Plug on all General Motors' cars. (R. 207; 368–69).

3. The Container Group, in turn, divided-up responsibilities. The Product Engineering Section was responsible for converter design. By contrast, the Production Engineering Section was responsible for developing tools, machines, and facilities for efficiently manufacturing converters designed by the Product Engineering Section. (R. 368; 1222–24; 1390)

4. The skills of the people who worked in these sections were compatible with their job functions. Product Engineering staff members were mechanical engineers with extensive experience in the design of automotive parts. Alternatively, Production Engineering staff members were mechanical engineers who were familiar with efficient ways to manufacture automotive parts. (R. 1222–23)

5. The initial objective of the Container Group was development of a downflow "replaceable element" catalytic converter. Catalysts which had been utilized up to that time were short-lived. Accordingly, it was felt necessary to have a converter to which fresh catalyst could be added periodically. (R. 208–09; 370; 376. Exhibit 220)

6. This type of downflow converter displayed two irremediable problems. First, it consisted of too many parts to be manufactured economically. Second, it leaked. A converter requiring the periodic addition of new catalyst could not be totally welded together. Therefore, under high temperatures, exhaust gas tended to by-pass the converter wherever removable parts joined with other parts. (R. 208–09; 376; 380–81; 1224–271; 1391–93)

7. Because of these problems, the Container Group abandoned replaceable element converters in late June or early July, 1970. Instead, attention was focused on development of a converter without removable parts. Although a "unitized" converter could not be refilled with fresh catalyst, Container Group staff members hoped that its welded seams would prevent the leakage and high costs associated with the replaceable element converter. (R. 261–2; 380–81; 1227–37)

8. The Container Group did not start from scratch in developing unitized converters. In fact, two of these converters had been developed within the Container Group prior to abandonment of the replaceable element converter.

9. The first converter concept developed within the Container Group was the CM–474 sketch. It was conceived on March 26, 1970 by Albert J. Moore, a draftsman for the Product Engineering Section. Moore worked alone in this endeavor. (R. 376–380; 550–54; 1393; 1399; 1411. Exhibit 112)

10. The most distinctive feature of the CM–474 sketch was the upper catalyst retainer plate (catalyst housing). It had a downwardly concave semicircular extension and an upwardly concave semicircular extension. Consequently, when the upper catalyst retainer plate was placed between the top housing plate (outer wrap—upper) and the bottom housing plate (outer wrap—lower), the extension created an inlet and outlet to the converter. (Exhibit 112)

11. Product Engineering staff members totally ignored the CM–474 sketch. Since the staff members still were concentrating their attention on development of a replaceable element converter in March and April, 1970, they apparently thought Product Engineering never made a model of the CM–474 concept. (Finding No. B(7). R. 550–56; 1411)

12. The second concept developed within the Container Group prior to abandonment of the replaceable element converter, and the first one to be considered actively by the Container Group, was the CM–714 converter. According to a General Motors' Record of Invention it was conceived on June 18, 1970 solely by Andrew Banyas, a Production Engineering staff member, and by John Jalbing, a staff member of Product Engineering. However, Moore also should be given some credit for the CM–714 converter since it was derived from the CM–714 sketch. (R. 369; 381–82; 710–716; 1222; 1227–37; 1403–4; 1410. Exhibits 113 and 257)

13. Although the CM–714 converter was like the CM–474 sketch in its use of an extended catalyst retainer plate, there were several differences between the two designs. First of all, the CM–714 converter had four plates rather than six. Secondly, both the top and bottom housing plates of the CM–714 converter had two semicircular extensions rather than just one. Finally, the lower catalyst retainer plate in the CM–

714 converter, rather than the upper catalyst retainer plate, had extensions into an inlet and outlet formed by the housing plates. (Exhibit 113)

14. The initial tests run on the CM–714 converter in August and September, 1970 produced mixed results. These tests showed that the CM–714 converter successfully reduced the concentration of pollutants in car exhaust and that the CM–714 converter presented very little resistance to exhaust gas flow. However, they also suggested that the CM–714 converter was not durable. The early CM–714 converters tended to balloon and to rupture at relatively low temperatures. (R. 389–96. Exhibit 138D)

15. Despite these disappointing results, the CM–714 converter was not abandoned. General Motors not only continued to perform tests with and on the CM–714 converter well into 1973, but also lauded the CM–714 converter on television and before an American Petroleum Institute meeting in September and November, 1970, respectively. (R. 396–97; 412–14. Exhibit 270)

16. The first type of supplemental experimentation initiated by General Motors was performed with the CM–714 converter, rather than on it. More particularly, the experimentation concerned converter placement, cooling loop routing, and emission and catalyst performance under different engine parameters, rather than the durability of the CM–714 converter at sustained high temperatures. General Motors began selling CM–714 converters for these purposes to its car divisions in September, 1970. Later that year, offers to sell and sales of CM–714 converters for these purposes also were made to International Harvester Corporation and to American Motors Corporation. In the latter cases, the sales always were made with the express reservation that the buyer respect General Motors' proprietary interests and that the buyer report all test results to General Motors. (R. 212; 400–418; 465; 1360–89. Exhibit 138A)

17. The second type of supplemental experimentation conducted by General Motors sought to evaluate the durability of CM–714 converters made from different types of metal and reinforced with different numbers of support studs. These tests were conducted mostly by General Motors between October, 1970 and June, 1973. Generally, they showed that a CM–714 converter made from stainless steel and reinforced with four studs could withstand considerably higher temperatures than could the original CM–714 converters which were unsupported and which were made from aluminized steel. (R. 263–68; 396–97; 568–82. Exhibits 138D, I, K, M and 139)

18. Despite these improved results, the CM–714 converter did not become General Motors' production-line catalytic converter. Another converter was conceived by Michael Foster, Albert Moore and James Haggart in early October, 1970, which had production advantages and some performance characteristics that were unmatched by the CM–714 converter. The new converter was called the CM–1090. (R. 565–67. Exhibits 114 and 270)

19. The CM–1090 converter closely resembled the CM–714 converter. Both designs contemplated four plates; both designs included top and bottom housing plates with two semicircular extensions; and both designs called for a bottom retainer plate with semicircular extensions into an inlet and outlet formed by the housing plates. However, only the CM–1090 converter included an upper retainer plate with semicircular extensions which nested with the semicircular extensions of the bottom retainer plate. Moreover, only the CM–1090 converter included an upper retainer plate with a peripheral flange that extended longitudinally and laterally between the flanges of the other plates. (Exhibit 114)

20. The first CM–1090 converter was built in January, 1971 and was tested in early February, 1971. The results of those tests were very promising. They showed that CM–1090 converters constructed from stainless steel and reinforced with four studs could withstand over 2000 degrees without structural deformity. (R. 417–24; 584–86. Exhibit 138K)

21. General Motors took two actions because of the encouraging performance of the CM–1090 converter. First of all, it abandoned the CM–714 converter as a production-line alternative well after February, 1971. Secondly, it applied for a patent on the CM–1090 converter on September 7, 1971. (R. 1383–84. Exhibits 101, 138, 139 and 447, 447b–1)

22. General Motors prosecuted its patent application for over three years. The first application was followed by a second application on December 23, 1971. The second application, in turn, was followed by a third application on June 14, 1972. On November 30, 1973, the Patent and Trademark Office (PTO) rejected all but one of the claims contained in the superceding third application. General Motors responded on February 12, 1974 by modifying and narrowing its claims. On April 1, 1974, the PTO allowed all but two of the modified claims. Displeased with this result, General Motors argued its cause orally before the PTO on May 23, 1974. As a result of General Motors' argument and the PTO's own review of four prior art patents—Scheitlin U.S. Patent No. 3,149,925; Fessler U.S. Patent No. 3,600,142; Patterson U.S. Patent No. 3,615,255; and Fessler U.S. Patent No. 3,702,236—all of the claims, as modified on February 12, 1974, were allowed. The '041 patent ultimately issued on December 3, 1974. (Exhibits 101, 115, 271, 272 and 274)

23. To date, General Motors has issued one license to manufacture its patented converter. In May, 1975, General Motors licensed Nissan Motor Company, Ltd. to manufacture the patented converter under a pending Japanese patent application which corresponds to the '041 patent. So far, this agreement has generated over one million dollars in royalty income for General Motors. Interestingly, no cars outfitted with converters made under this license are sold within the United States. (R. 623–638. Exhibits 127 and 456)

C. *Toyota's Experience*

1. Toyota Motor Company, Ltd. is a Japanese corporation with its principal place of business in Toyota, Japan. Toyota Motor Sales Company, Ltd. is a Japanese corporation with its principal place of business in Nagoya, Japan. Toyota Mid-American Distributors, Inc., is incorporated in Delaware and has its principal place of business in Carol Stream, Illinois.

2. Toyota's initial research into catalytic converters was not as productive as General Motors'. Although Toyota began to develop converters at about the same time that General Motors did, it did not produce a converter which it thought was suitable for durability testing until October, 1971. (R. 292; 305–06; 313–14. Exhibit 136)

3. The results of this testing program were very disappointing. Prototype converters regularly ruptured or sagged when they were subjected to high temperatures. Accordingly, by early April, 1972, Toyota was looking actively for a new converter design. (R. 306–27; Exhibit 133(21) pp. 856, 863, 877, 895–97; Exhibit 136(23))

4. Toyota found that design at a public hearing conducted in Washington, D.C. on April 17, 1972. At the request of the Environmental Protection Agency, General Motors gave a status report that day on its efforts to achieve the recently enacted federal exhaust emissions standards. As part of its presentation, General Motors displayed and explained a modified version of the CM–1090 converter. Kiyoshi Matsumoto of the Toyota Motor Company, Ltd. seized this opportunity to make a detailed sketch of General Motors' converter which he subsequently delivered to his company's converter research group in Japan. (R. 327–52. Exhibit 134(3))

5. Armed with the Matsumoto sketch, Toyota constructed a converter which contained all of the essential elements of the patented converter, but in slightly modified form. Thus, both designs were alike in their use of: four plates; catalyst retainer plates with extensions into either the inlet or outlet formed by the housing plates; catalyst retainer plates with peripheral flanges that extended laterally and longitudinally between the flanges of the other plates; an inclined catalyst bed; and, two-

layer peripheral walls immediately inboard the common edge of the four plates. However, the Toyota converter differed from the patented converter to the extent that the former converter had: an upper catalyst retainer plate which extended only into the inlet formed by the housing plates; a lower catalyst retainer plate which extended only into the outlet formed by the housing plates; and, an additional piece of metal attached to the inlet end of the upper catalyst retainer plate. (R. 436–59. Exhibits 107, 109, 117, 118, 120, 134(6)(11)(12), 136(14)(15), 151, 152 and 447)

6. The results of tests run on Toyota's General Motors style converter in 1972 and 1973 were satisfactory. Thus, by June, 1973, Toyota was able to report to the Environmental Protection Agency that it had solved most of the problems which it had confronted only one year earlier. (Exhibit 136(23))

7. It is this modified version of General Motors' patented converter which Toyota ultimately put into production and which General Motors now asserts infringes claims five (5) through eight (8) of the '041 patent. (Exhibit 120)

APPENDIX B

Figure 1a

UPPER HOUSING (TOP) PLATE

UPPER CATALYST RETAINING (INTERMEDIATE) PLATE

LOWER CATALYST RETAINING (INTERMEDIATE) PLATE

LOWER HOUSING (BOTTOM) PLATE

Figure 1b

UPPER HOUSING (TOP) PLATE

UPPER CATALYST RETAINING
(INTERMEDIATE) PLATE

LOWER CATALYST RETAINING
(INTERMEDIATE) PLATE

LOWER HOUSING (BOTTOM) PLATE

Figure 2a

Relevant Elements Of Toyota Converter

APPENDIX B—Continued

Figure 2b

Relevant Elements Of Patented Converter